**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 91-4793

---

JIM VANDERBILT,

Petitioner-Appellee,

versus

JAMES A. COLLINS, Director,
Texas Department of Criminal
Justice, Institutional Division,

Respondent-Appellant.

---

Appeal from the United States District Court
For the Eastern District of Texas

---

(     June 17, 1993     )

Before POLITZ, Chief Judge, KING and EMILIO M. GARZA, Circuit
Judges.

POLITZ, Chief Judge:

The State of Texas appeals the grant of a writ of habeas
corpus vacating the death sentence imposed on Jim Vanderbilt and
barring the reimposition of a death sentence at any subsequent
sentencing proceeding.  For the reasons assigned, we affirm in part
and vacate in part.

## Background

On April 1, 1975, Vanderbilt, a former police officer, kidnapped Katina Moyer, a 16-year-old girl, while she was in her car waiting to pick up her schoolteacher mother. At gunpoint he handcuffed Moyer and took her to his home, intending to rape her. Noticing that Moyer was looking around the house intently, as if trying to memorize everything she could about his house, he put her in her auto and drove to a secluded spot outside Amarillo where he fatally shot her in the head with his .357 pistol. He left her body where it fell and drove to the outskirts of Amarillo where he abandoned her car on the highway with the blinkers flashing and hitched a ride back into town.

## The Psychiatric Examination

In May, 1975 prior to the first trial, Vanderbilt's counsel requested that Vanderbilt be examined by a psychiatrist. Counsel had advised against the examination, but Vanderbilt insisted. The motion requesting the examination did not specify the purposes. The court granted the motion, but required that the results be released to the state. We find no written order for the examination in the record of the first trial. Vanderbilt was examined over the course of two days by Drs. Kracke and Klein, working under the supervision of Dr. Kenneth McTague. Dr. McTague summarized their examinations in a letter informing the court of their conclusion that Vanderbilt was sane and competent to stand trial.

2

## The First Trial

The district court described the evidence at trial as follows:

> From the circumstantial evidence introduced at trial, the jury could reasonably find that the applicant and the deceased victim, Moyer, left the applicant's house in her automobile, on the evening of her death, at approximately 4:30 p.m.; and that they drove north on the Dumas Expressway out of the city of Amarillo. Further, they could have found that the applicant abandoned Moyer's car along the Dumas Expressway, south of where Moyer was found shot, at approximately 6:00 p.m.
>
> In addition, experts testified at trial that Moyer had bruises on her wrists which could have been caused by handcuffs, and that the bullet with which she was killed was a .38 or .357 luballoy, or copper-coated bullet. Other testimony showed that the applicant possessed handcuffs with traces of blood of the same type as Moyer's on the inside of one of the cuffs.

In addition, the state introduced the testimony of two police officers who heard Vanderbilt make an oral confession on the night of his arrest. Officer Davis testified that "He said he wanted to scare her, and she was telling him that she wouldn't tell on him. He put his gun to the back of her head and cocked it. . . . He said the gun went off and she fell to the ground." Officer Boydston's account was similar. Also according to Officer Davis, Vanderbilt stated that after killing Moyer he removed the handcuffs, drove to the outskirts of Amarillo, abandoned her car on the highway with its blinkers on, and then was picked up by a passing motorist. Upon returning to town he went home, got his car, and drove around "looking for another girl."

Based upon this evidence, Vanderbilt was found guilty of capital murder. Neither the state nor Vanderbilt put on any

3

additional evidence during the penalty phase.[1]  The jury answered "yes" to special issue number two, finding that Vanderbilt "would commit criminal acts of violence that would constitute a continuing threat to society."[2]  Vanderbilt was sentenced to death.

### The Reversal

The Texas Court of Criminal Appeals overturned the conviction for trial error related to the exclusion of evidence on the issue of the voluntariness of Vanderbilt's confessions;[3] the appellate court did not address Vanderbilt's claim alleging insufficient evidence of future dangerousness to support the death sentence.[4]

---

[1]  Under the Texas capital sentencing scheme in effect at the time, the same jury that found a defendant guilty of capital murder also had to determine, after a separate sentencing hearing, whether to impose the death penalty.  Tex. Code Crim Proc. Ann. art. 37.071(b)(2) (Vernon 1981).

[2]  To determine whether the death penalty should be imposed, the following special issues were submitted to the jury at the conclusion of the evidence in the sentencing hearing:
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would follow;
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Imposition of the death penalty was appropriate only if the jury determined beyond a reasonable doubt that the questions must be answered in the affirmative.  Tex. Code. Crim. Proc. Ann. art. 37.071(b) and (c).  In Vanderbilt's case, the third special issue was inapplicable and was not submitted to the jury.

[3]  **Vanderbilt v. State**, 563 S.W.2d 590 (Tex.Crim.App. 1978) (**Vanderbilt** I).

[4]  At the time the Texas Court of Criminal Appeals issued its ruling, retrial of a defendant whose conviction was

The appellate court stated, however:

> [W]e note that the State introduced no evidence at the punishment stage of the trial. In the event of a re-trial, we call attention to the recent case of **Warren v. State**, 562 S.W.2d 474, on sufficiency of the evidence to support an affirmative finding to special issue No. 2 of Art. 37.071, V.A.C.C.P.[5]

### The Second Guilt Phase

Vanderbilt was retried, and was again convicted and sentenced to death. The only new evidence presented during the second trial's guilt phase was the testimony of Jerre Kris Tucker. She testified that she had been sexually molested by Vanderbilt on March 27, 1975. On that evening she had just gotten into her car in a shopping mall parking lot after work when he opened the driver's door of her car, produced a pistol, and demanded that she move over. Vanderbilt got in the car, handcuffed her, drove to a secluded construction area which was not occupied at that time of night, and sexually molested her. He then released her a few blocks from the abduction site and returned her auto to the mall parking lot.

### The Second Penalty Phase

During the second penalty phase, the state introduced five witnesses who testified to Vanderbilt's bad reputation in the community for being peaceful and law-abiding: four police officers and Jerre Tucker. The state also introduced the testimony of

---

overturned for insufficient evidence was not considered to be automatically barred by the double jeopardy clause. See **United States v. Bass**, 490 F.2d 846 (5th Cir. 1974).

[5] 563 S.W.2d at 599 n.4.

Dr. McTague regarding Vanderbilt's future dangerousness. Defense counsel was not informed that the state planned to have McTague testify regarding Vanderbilt's future dangerousness until he was called. There is also conflicting testimony regarding whether Vanderbilt was given any **Miranda**-type warnings before the examination, and if any were given, the extent of the warnings. It is undisputed, however, that neither Vanderbilt nor his counsel was informed that results of the examination could be used on the issue of Vanderbilt's future dangerousness.

McTague testified that in his opinion, based upon the examinations by him and Drs. Kracke and Klein, that Vanderbilt was "extremely well controlled, well-guarded, extremely deliberate in his actions," that "when he is affected by emotionality that he is likely to be very impulsive," he was likely "to act without thinking or without being aware of the consequences of his behavior." In addition, McTague concluded that Vanderbilt had "no conscience," had no "feeling of wrongness" regarding what he had done, did not learn much from past experience, and had "a general identity problem in the area of sexuality." On direct examination, McTague was asked if, assuming that Vanderbilt kidnapped and sexually assaulted one young woman and then five days later kidnapped and shot and killed another, was he was likely to commit future acts of violence. McTague responded: "The research indicates that the best predictor of future behavior is past behavior. If someone has done actions like you describe several times, then it is increasing the likelihood that they may do it

6

again as opposed to not."  McTague also responded on cross-examination that based upon the "papers . . . assimilated four and one half years ago" he found it probable that Vanderbilt would be dangerous in the future.

### The Habeas Relief

Following the second conviction, the appeals therefrom,[6] and exhaustion of state habeas proceedings, Vanderbilt filed a petition for federal habeas corpus relief.  He raised challenges to the use of Dr. McTague's testimony during the penalty phase of the second trial as violative of his fifth and sixth amendment rights, and double jeopardy challenges asserting that the evidence in both the guilt and penalty phases of the first trial was legally insufficient.  The district court partially granted the writ and vacated the death sentence, after conducting an evidentiary hearing and finding that the psychiatrist's testimony during the second penalty phase violated Vanderbilt's fifth and sixth amendment rights under **Estelle v. Smith**.[7]

The state moved for reconsideration, asking that the order vacating the death sentence be made conditional upon allowing the state the opportunity to commute the sentence or retry the penalty phase.  In addition, Vanderbilt moved for reconsideration of his double jeopardy challenges.  Upon reconsideration, following the dictates of then-existing circuit precedent, the district court

---

[6]  **Vanderbilt v. State**, 629 S.W.2d 709 (Tex.Crim.App. 1981) (Vanderbilt II), cert. denied, 456 U.S. 910 (1982).

[7]  451 U.S. 454 (1981).

7

engaged in a painstaking review of the sufficiency of the evidence at the first trial and found that there was insufficient evidence of future dangerousness presented during the first penalty phase. As a result, the district court found that the death sentence following the second trial was imposed in violation of the double jeopardy clause. The state timely appealed.

ANALYSIS

I.   The Double Jeopardy Claim

In **Burks v. United States**,[8] the Supreme Court held that the double jeopardy clause prevents a retrial once a reviewing court determines that the evidence at the first trial was insufficient.[9] As the Court noted, "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding."[10]

Under **Bullington v. Missouri**,[11] the double jeopardy clause applies to capital sentencing proceedings. **Burks** interacts with **Bullington** to provide that if "an appellate court under **Burks** finds the prosecution's evidence in support of the death penalty insufficient, the defendant cannot again be made to face a possible

---

[8]   437 U.S. 1 (1978).

[9]   **Id.** at 18.

[10]   **Id.** at 11.

[11]   451 U.S. 430 (1981).

8

death sentence."[12]

In **United States v. Sneed**,[13] we extended **Burks** to provide that the double jeopardy clause bars retrial when the appellate court reverses for trial error but refuses to consider a meritorious insufficiency claim.[14]  In addition, we have held that, because of double jeopardy implications, inquiry into insufficiency claims is required on habeas review.[15]  Based upon **Sneed** and its progeny, the court *a` quo*, after determining that there was insufficient evidence of future dangerousness at the first trial to support the death penalty, concluded that the state was prohibited from pursuing the death penalty in the second trial.[16]

---

[12]  **Jones v. Thigpen**, 741 F.2d 805, 815 (5th Cir. 1984), vacated on other grounds, 475 U.S. 1003 (1986).  The Texas Court of Criminal Appeals also has held that a capital defendant who makes a meritorious challenge to the sufficiency of the evidence in the trial phase may not be retried "wherein the State seeks the death penalty," if the conviction is also reversed for trial error in the guilt phase.  **Brasfield v. State**, 600 S.W.2d 288, 298 (Tex.Crim.App. 1980), overruled on other grounds by, **Janecka v. State**, 739 S.W.2d 813 (Tex.Crim.App. 1987).

[13]  705 F.2d 745 (5th Cir. 1983).

[14]  "Our refusal to address the sufficiency issue in the first appeal is not a license for the government to 'make repeated attempts to convict [the defendant] for [the] alleged offense . . . .  Whether or not the issue is addressed on appeal, 'the government must present sufficient evidence the first time to get a second chance.'"  705 F.2d at 748 (footnotes omitted).

[15]  **Cordova v. Lynaugh**, 838 F.2d 764, 766 n.1 (5th Cir.), cert. denied, 486 U.S. 1061 (1988); **French v. Estelle**, 692 F.2d 1021 (5th Cir. 1982), cert. denied, 461 U.S. 937 (1983).

[16]  The parties also address whether the application of **Burks** and **Sneed** was appropriate under **Teague v. Lane**, 489 U.S. 288 (1989).  **Burks** was decided in the interim between the reversal of Vanderbilt's first conviction and the second trial.  **Bullington** was also decided before the second conviction became final.  As a result, there is no retroactivity problem.  See

Shortly after the district court granted the writ in the instant case, the panel opinion in **United States v. Miller**[17] was rendered. **Miller** held that the Supreme Court's decision in **United States v. Richardson**[18] implicitly overruled **Sneed.**[19] **Richardson** held that the double jeopardy clause does not prohibit a retrial following a hung jury, whether or not the evidence in the original trial was insufficient. **Richardson** reached that conclusion because the Court found that, given the jury's inability to reach a verdict, there had been no event which terminated the original jeopardy; in the absence of a jeopardy terminating event, there was no constitutional requirement to consider the sufficiency of the evidence presented at the initial trial.[20] Also embracing this theory of continuing jeopardy, the **Miller** panel found that when a conviction has been reversed for trial error there is no jeopardy terminating event. As a result, the **Miller** court found that when a conviction is reversed for trial error, there is no constitutional requirement to consider the sufficiency of the

---

**Tibbs v. Florida**, 457 U.S. 31 (1982) ("We have applied **Burks** to prosecutions that were not final on the date of that decision." -- **Burks** applied when decided in interim between reversed conviction and retrial).

[17] 952 F.2d 866 (5th Cir.), <u>cert. denied sub nom</u>. **Huls v. United States**, 112 S.St. 3029 (1992).

[18] 468 U.S. 317 (1984).

[19] 952 F.2d at 871.

[20] 468 U.S. at 323-25.

10

evidence in the initial trial.[21]

The theory of continuing jeopardy embraced by both **Richardson** and **Miller** has had an unsettled history in double jeopardy jurisprudence. The concept was first introduced by Justice Holmes dissenting in **Kepner v. United States**.[22] Holmes' formulation has never gained acceptance by a majority of the Supreme Court.[23] Continuing jeopardy, however, "has occasionally been used to explain why an accused who has secured the reversal of a conviction on appeal may be retried for the same offense."[24] Despite this use, the Supreme Court has repeatedly noted that there is a better explanation for allowing retrial:

> It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.[25]

Continuing jeopardy reappeared in 1984 in two Supreme Court double jeopardy opinions: **Richardson** and **Justices of Boston Municipal Court v. Lydon.**[26] **Lydon**, for example, involved a two-

---

[21]   952 F.2d at 872.

[22]   195 U.S. 100 (1904). Justice Holmes "argued that there was only one continuing jeopardy until the proceedings against the accused had been finally resolved. He held to the view that even if an accused was retried after the Government had obtained reversal of an acquittal, the second trial was part of the original proceeding." **Price v. Georgia**, 398 U.S. 323, 327 (1970).

[23]   **Breed v. Jones**, 421 U.S. 519, 534 (1975).

[24]   **Id.** at 534 (citations omitted).

[25]   **Burks**, 437 U.S. at 15 (quoting **United States v. Tateo**, 377 U.S. 463, 466 (1964)); **Breed**.

[26]   466 U.S. 294 (1984).

11

tiered system for criminal trials employed in Massachusetts. For certain offenses, a defendant could opt for either the traditional jury trial and attendant appellate review or for a bench trial. If unsatisfied with the bench trial the defendant had a right to a <u>de novo</u> jury trial without being required to point to any error in the bench trial. There was no right to appellate review of the bench trial, but the subsequent jury trial was subject to review. A defendant, convicted in the initial bench trial contended that the subsequent jury trial would violate double jeopardy because he asserted that there was insufficient evidence presented in the bench trial. The Court, in a divided opinion, held that the defendant had experienced no jeopardy terminating event such as an acquittal or an unreversed appellate finding of insufficiency, so there was nothing preventing retrial.[27] Similarly, in **Richardson**, as noted earlier, the Court held that for lack of a jeopardy terminating event, there was no constitutional requirement to consider the sufficiency of the evidence presented in a trial which results in a hung jury.[28]

---

[27] **Id.** at 308-10. Justices Marshall and Brennan in a concurring opinion noted that the continuing jeopardy analysis begs the question: The defendant in **Lydon** presented a claim of insufficiency, but the Court refused to consider the claim, although its consideration could have led to such an appellate determination which, in turn, could have constituted a jeopardy terminating event. 466 U.S. at 319 (Brennan, J., concurring). In fact, the district court and the First Circuit, considering the matter on habeas, both determined that there was insufficient evidence at the bench trial. The Supreme Court, however, neither considered this determination by the First Circuit a jeopardy terminating event nor reversed the sufficiency determination on the merits.

[28] 468 U.S. at 325-26.

12

The State of Texas argues that in light of the intervening **Miller** holding, the writ vacating the death sentence was improperly granted. **Miller** holds that after **Richardson**, the **Burks** bar only prevents retrial when the appellate court <u>in fact</u> reverses for insufficient evidence. Texas argues that under the **Miller** holding, it is now error for the district court, on habeas review, to consider the sufficiency issue.

After **Lydon** and **Richardson**, it appears that there are only three possible jeopardy terminating events: (1) an acquittal, (2) a trial court determination of insufficiency leading to a directed verdict of acquittal,[29] and (3) an unreversed determination on direct appeal that there was insufficient evidence to support the conviction.[30] In the absence of one of these events, a later determination that there was insufficient evidence apparently will not bar a retrial. It also appears that the double jeopardy claims recognized on habeas review in **French v. Estelle** and **Cordova v. Lynaugh** are no longer cognizable in light of **Lydon**, **Richardson**, and **Miller.**

One must share the concern raised by the appellee and by Justices Brennan and Marshall dissenting in **Richardson**, that if on direct appeal, the court is presented with two valid challenges to a conviction, one based upon trial error and another based upon sufficiency, the defendant's double jeopardy rights may depend upon the whim of the appellate court in determining the ground for

---

[29] **Hudson v. Louisiana**, 450 U.S. 40 (1981).

[30] **Burks.**

13

reversal.[31]  According to **Miller**, when an appellate court is presented with two such challenges, it is "clearly the better practice" to dispose of a properly presented claim of insufficiency, but it is not mandated by the double jeopardy clause.[32]  Vanderbilt argues that by preventing consideration of an insufficiency claim by courts other than the first appellate court, **Miller** denies a capital defendant's right to "meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily."[33]  Such concern is particularly apt in this case; although the Texas Court of Criminal Appeals did not reach Vanderbilt's insufficiency claim regarding the first penalty phase, the court suggested in <u>dicta</u> that the evidence in fact may have been insufficient.[34]  **Lydon, Richardson**, and **Miller** require that we ignore the concerns voiced by the Texas Court of Criminal Appeals in its initial ruling and the determination by our trial judge that

---

[31]  468 U.S. at 327 (Brennan, J., dissenting).

[32]  952 F.2d at 874.

[33]  **Parker v. Dugger**, 498 U.S. 308, ___, 111 S.Ct. 731, 739 (1991).

[34]  The court directed the trial court's attention to **Warren v. State**, 562 S.W.2d 474 (Tex.Crim.App. 1978), a case in which the Texas court found insufficient evidence of future dangerousness when the prosecution relied only upon the evidence of the offense itself -- the murder of a homeowner who surprised the defendant in the course of a burglary -- which was deemed "not a calculated act," and the defendant had only a single prior conviction for burglary.  The evidence presented in Vanderbilt's first trial was quite similar to that presented in **Warren**, suggesting that the Texas Court of Criminal Appeals, while disinclined to engage in a full sufficiency analysis, was concerned that the evidence at Vanderbilt's first trial was insufficient to prove future dangerousness.

there was insufficient evidence to support the death sentence imposed following Vanderbilt's first trial. Albeit with significant reservations, we are constrained to follow circuit precedent, absent legislation, intervening Supreme Court teachings or an *en banc* holding to the contrary. Accordingly, the district court's order, to the extent that it prohibits the state from sentencing Vanderbilt to death in a subsequent sentencing hearing, must be vacated.

## 2.    The Fifth and Sixth Amendment Claims

### Fifth Amendment

The state contends that the district court erred in finding that Dr. McTague's testimony violated Vanderbilt's fifth amendment rights as articulated in **Estelle v. Smith.**[35] We review the district court's findings of fact for clear error, but consider issues of law *de novo*.[36]

**Estelle** held that the state's use, during the penalty phase of a capital trial, of the testimony of a psychiatrist who performed a court-ordered competency examination on the defendant, violated the defendant's fifth amendment rights. The fifth amendment violation arose because the defendant was not informed that statements made during the examination could be used during the penalty phase.

The state attempts to distinguish **Estelle** on two grounds:  (1)

---

[35]    **451 U.S. 454 (1981).**

[36]    **Barnard v. Collins**, 958 F.2d 634 (5th Cir. 1992), <u>cert. denied</u>, 113 S.Ct. 990 (1993).

15

in **Estelle** the examination was conducted at the court's direction, not at the defendant's request; and (2) in **Estelle** the examination was specifically limited to competency while Vanderbilt's request did not specify the purposes of the examination. These are distinctions without difference.

We disposed of the first argument in **Battie v. Estelle**,[37] shortly after **Estelle** was decided. If a defendant requests an examination on the issue of future dangerousness or presents psychiatric evidence at trial, the defendant may be deemed to have waived the fifth amendment privilege.[38] Vanderbilt did neither. As in the case at bar, Battie's defense counsel requested a competency and sanity psychiatric examination of his client. The trial court granted the request and appointed two doctors to examine Battie. Battie's counsel did not introduce psychiatric testimony at trial, but the state used the doctors' testimony at trial on the issue of future dangerousness. The **Battie** court determined that examination by a court-appointed psychiatrist amounted to custodial interrogation for purposes of **Miranda**,[39] and concluded that "the fact that the defense requested the examination does not obviate the necessity for giving the **Miranda** warnings where the defense did not request such an examination on the

---

[37] 655 F.2d 692 (5th Cir. 1981).

[38] **See** Buchanan v. Kentucky, 483 U.S. 402 (1987); **Schneider v. Lynaugh**, 835 F.2d 570 (5th Cir. 1988).

[39] 655 F.2d at 699-700.

16

question of future dangerousness."[40]

The state's second argument is disposed of based upon the factual findings made by the district court. While it is true that Vanderbilt's counsel's request for the psychiatric examination did not specify the purposes of the examination, the district court concluded as a matter of fact that it was, in effect, a request for a competency and sanity examination. This conclusion is fully supported by the evidence of record. For example, both Drs. Kracke and Klein testified that they understood the examination to be limited to the issues of sanity and competence.[41] Kracke also testified that he received a written order from the trial judge to perform a sanity and competency examination.[42] Also, at the hearing on Vanderbilt's motion to appoint a psychiatrist to conduct the examination, the prosecutor complained that such appointment was inappropriate because there was no "reason for this court to doubt the defendant's competency to stand trial or his sanity at the time of the commission of the offense." Thus, the district court's finding that this examination was clearly understood by all parties to be limited to the issues of sanity and competence is not clearly

---

[40]   655 F.2d at 702; accord **Wilkens v. State**, 847 S.W.2d 547 (Tex.Crim.App. 1992).

[41]   In fact, neither was aware that future dangerousness was even an issue in capital sentencing.

[42]   Although that order is not in the record of any of Vanderbilt's proceedings, the district court was entitled to credit Dr. Kracke's testimony.

erroneous.[43]

Finally, the state contends that the interpretation of **Estelle** advanced by the court in **Battie** and the district court hereinSQ requiring a **Miranda** warning that the examination results may be used at sentencingSQshould be reconsidered in light of **Colorado v. Spring**[44] and **Oregon v. Elstad**.[45]  In both **Spring** and **Elstad** the Court emphasized that a knowing and voluntary waiver of **Miranda** rights does not require that the defendant understand every possible consequence of the decision to waive the right.[46]

The application of **Miranda** in the setting of a psychiatric examination is quite different from its application in an ordinary police interrogation.  For one thing, the incriminating character of particular answers or actions may not be readily apparent to the defendant subject to a psychiatric examination.  We note that as recently as 1989, after both **Spring** and **Elstad**, the Supreme Court in **Powell v. Texas**[47] characterized **Estelle**'s teaching as follows:

> In **Estelle v. Smith** we held that a capital defendant's Fifth Amendment right against compelled self-incrimination precludes the state from subjecting him to

---

[43]  In effect, the district court recognized that although defense counsel made a "global" request, the universe of reasonably foreseeable possibilities for such an examination was limited to the issues of sanity and competence.

[44]  **479 U.S. 564 (1987).**

[45]  470 U.S. 298 (1985).

[46]  **Elstad** (need not inform defendant that prior un-Mirandized confession could not be used against him); **Spring** (need not inform the defendant of the specific crime about which he will be questioned).

[47]  492 U.S. 680 (1989).

18

> a psychiatric examination concerning future dangerousness
> without first informing the defendant that he has the
> right to remain silent and that anything he says can be
> used against him <u>at a sentencing proceeding</u>.[48]

Accordingly, we decline to hold that **Spring** and **Elstad** implicitly overrule **Battie** or limit **Estelle.** The district court properly concluded that failure to inform Vanderbilt that the psychiatric examination could be used against him at the sentencing phase on the issue of future dangerousness, and the subsequent use of the testimony against him for that purpose, was a violation of his fifth amendment rights.

Sixth Amendment

**Estelle v. Smith** also taught that when defense counsel is not informed that the psychiatric examination of his client will be used by the state on the issue of future dangerousness, the client is deprived of the "guiding hand" of counsel in determining whether and to what extent to cooperate with the examination.

The state argues that because the motion for an examination did not specify the purposes of the examination, defense counsel was on notice that the examination could encompass the issue of future dangerousness. Again, this ignores the district court's finding that the examination was limited to sanity and competencySQa finding which we have concluded was not clearly erroneous.

The Supreme Court consistently has recognized the importance of a capital defendant's right to consult defense counsel regarding

---

[48]   492 U.S. at 681 (emphasis supplied).

19

possible psychiatric examination. "[F]or a defendant charged with a capital crime, the decision whether to submit to a psychiatric examination designed to determine his future dangerousness is 'literally a life or death matter' which the defendant should not be required to face without 'the guiding hand of counsel.'"[49] For consultation with counsel to be effective, it "must be based on counsel's being informed about the scope and nature of the proceeding."[50] When counsel does not know that the court-ordered psychiatric examination of the defendant will entail the issue of future dangerousness, then the defendant is deprived of the "guiding hand" of counsel.[51] "[I]t certainly is not unfair to require the state to provide counsel with notice before examining the defendant concerning future dangerousness."[52]

The district court noted that from the record of the evidentiary hearing it is evident that in 1975, when the psychiatric examination of Vanderbilt was conducted, no one anticipated that the examination would encompass the issue of future dangerousness. The district court suggested that to infer, years after the fact, that Vanderbilt validly waived any fifth or sixth amendment objections arising from that examination is "highly dubious." We agree. Vanderbilt's counsel, unlike counsel in

---

[49] **Satterwhite v. Texas**, 486 U.S. 249, 254 (1988) (citations omitted).

[50] **Buchanan**, 483 U.S. at 424.

[51] **Powell**, 492 U.S. at 685.

[52] **Id.**

**Buchanan**, did not have adequate information regarding the scope of the psychiatric examination; accordingly, Vanderbilt was deprived of his sixth amendment right to counsel when the competency and sanity examination also encompassed the issue of future dangerousness.

Harmless Error Analysis

In **Satterwhite**, the Court held that harmless error analysis applies to the admission of psychiatrist testimony in violation of the sixth amendment, as set out in **Estelle**.[53] The district court here found that under the **Chapman v. California**[54] harmless error standard,[55] the error in this case was not harmless.

The Supreme Court recently held that **Chapman** does not apply on habeas corpus review;[56] instead, claims on habeas are subject to the harmless error analysis in **Kotteakos v. United States**.[57] "The test under **Kotteakos** is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'"[58]

At the penalty phase, the prosecution's case consisted of the testimony of five witnesses regarding Vanderbilt's bad reputation

---

[53]   486 U.S. at 258.

[54]   386 U.S. 18 (1967).

[55]   Under **Chapman** the standard for determining whether a conviction must be set aside due to federal constitutional error is whether the error was "harmless beyond a reasonable doubt." 386 U.S. at 24.

[56]   **Brecht v. Abrahamson**, 113 S.Ct. 1710 (1993).

[57]   328 U.S. 750 (1946).

[58]   **Brecht**, 113 S.Ct. at 1722 (quoting **Kotteakos**, 328 U.S. at 776).

21

in the community for being a peaceful and law-abiding citizen: four police officers involved in the investigation of Moyer's murder, and Jerre Tucker. The district court noted that Dr. McTague's testimony "was approximately four times the combined length of the other five states' witnesses." This necessarily suggests that McTague's testimony would have substantial impact on the jury.[59]

The state contends, however, that Dr. McTague's conclusion that Vanderbilt posed a threat to society was based not upon the 1975 examination, but upon a hypothetical question regarding his past behavior. Like the district court, we find that Dr. McTague's testimony must be viewed as a whole. The "hypothetical" question was presented to Dr. McTague only after he had an opportunity to testify, at great length, about his perceptions regarding Vanderbilt. He described him as "controlled, well-guarded," "extremely deliberate," likely "to act without thinking," unaware of "the consequences of his behavior," with "no conscience," and with sexual identity problems; or as the district court aptly characterized, he depicted Vanderbilt "as a remorseless, extremely impulsive, virtually unreformable man likely to react recklessly and uncontrollably to emotional stress." Following this build up, the prosecutor posed the hypothetical that, assuming Vanderbilt

---

[59] The district court's determination and that apparently of the Texas Court of Criminal Appeals, that there was insufficient evidence at the first penalty phase, though rendered moot by our double jeopardy analysis, demonstrates that the state would have to rely on something more than Vanderbilt's offense, itself, to establish, beyond a reasonable doubt, that he posed a threat of future dangerousness.

kidnapped and sexually assaulted one young woman then five days later kidnapped and shot and killed another, was he likely to be dangerous in the future?  Dr. McTague responded that past behavior was the best indicator of future behavior, and such assumed conduct would increase the likelihood of future dangerousness.

We are unwilling to accept the state's contention that Dr. McTague's conclusion regarding future dangerousness, and the damaging impact of his testimony, was limited to this statement. Certainly, the jury could have formed its opinion regarding future dangerousness, at least in part, from its own understanding of the character traits attributed to Vanderbilt by this psychiatric expert.  In **Satterwhite**, the Court found harmful error, albeit under the **Chapman** standard, from a psychiatrist's testimony on future dangerousness in violation of **Estelle**, when that testimony was a much less significant part of the evidence presented in the penalty phase.  In **Satterwhite** the evidence, other than the psychiatrist's testimony, included the defendants four prior felony convictions, testimony by his former step-father that Satterwhite once shot him during an argument, eight character witnesses of his bad reputation for being a law-abiding citizen, and a psychologist's testimony that he may be a continuing threat to society.  In that context, the Court found harmful error.[60]

The district court in this case, after reviewing the record of the second sentencing phase, found that Dr. McTague's testimony was a substantial part of the state's case.  We agree.  We conclude

---

[60]    486 at 259-60.

that Vanderbilt's claim satisfied the **Kotteakos** harmless error standard. We think it would strain credulity to conclude that Dr. McTague's testimony, which was quite lengthy and bore the imprimatur of an expert's opinion, did not have a substantial, injurious effect on the outcome of Vanderbilt's second penalty phase.

It is with exceeding reluctance that we conclude that the State of Texas may now try for a third time to present sufficient competent evidence to establish Jim Vanderbilt's future dangerousness, primarily because we agree with our district judge and apparently the Texas Court of Criminal Appeals that the state failed to do so the first time. We AFFIRM the district court's grant of the writ insofar as it vacates Vanderbilt's death sentence, but to the extent that the district court held that the state may not reimpose the death penalty following a proper, third sentencing hearing warranting such, we are obliged to direct that the order be VACATED.

AFFIRMED IN PART, VACATED IN PART.


EMILIO M. GARZA, Circuit Judge, concurring specially:


"The Fifth Amendment privilege [against compelled self-incrimination] . . . is fulfilled only when a criminal defendant is guaranteed the right `to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.'" *Estelle v. Smith,* 451 U.S. 454,

24

467-68, 101 S. Ct. 1866, 1875, 68 L. Ed. 2d 359 (1981) (quoting *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S. Ct. 1489, 1493-94, 12 L. Ed. 2d 653 (1964)). Vanderbilt insisted, against the advice of counsel, upon submitting to a psychiatric evaluation, even though he was informed that the results of the evaluation would be made available to the prosecutor. Vanderbilt was the victim of neither coercion nor deception, but instead "ch[ose] to speak in the unfettered exercise of his own will."

I agree with the majority that, under our decision in *Battie v. Estelle,* 655 F.2d 692 (1981), "the fact that the defense requested the examination does not obviate the necessity for giving the *Miranda* warnings where the defense did not request such an examination on the question of future dangerousness." *See id.* at 702. However, I write separately to express my view that *Battie,* insofar as it affords relief to a criminal defendant who has spoken in the unfettered exercise of his own will, against the advice of counsel, is adrift from the fundamental interests protected by the Fifth Amendment, *Miranda,* and *Estelle*. I concur specially in Part II of the majority's opinion.