# United States Court of Appeals for the Fifth Circuit

No. 20-70008
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

November 9, 2022

Lyle W. Cayce
Clerk

Arturo Daniel Aranda,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent—Appellee*.

Appeal from the United States District Court
For the Southern District of Texas
USDC No. 6:89-CV-13

Before Haynes, Graves, and Engelhardt, *Circuit Judges*.

Per Curiam:*

Petitioner Arturo Aranda was convicted of the murder of a police officer and sentenced to death. Following state court proceedings, Aranda petitioned for a writ of habeas corpus in federal court, which the district court

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-70008

denied.  Aranda then sought a certificate of appealability on various issues from this court.  We granted the certificate of appealability on two issues: (1) Aranda's *Miranda* claim and (2) Aranda's ineffective-assistance-of-counsel-claim.  Having now considered those issues on the merits and having held oral argument, we affirm the district court.

## I

Early in the morning hours of July 31, 1976, brothers Arturo and Juan Aranda were in the process of transporting a large quantity of marijuana from Laredo to San Antonio, Texas.  The brothers were stopped by Officers Pablo Albidrez and Candelario Viera of the Laredo Police Department.  A gunfight erupted, and Officer Albidrez was shot through the chest and killed.  The Aranda brothers were apprehended and arrested near the scene.

During the gunfight, Arturo Aranda was hit in the shoulder and hand. He was transported to a hospital, where a .38 caliber handgun was found hidden in his pants.  Ballistic testing later showed that this weapon could have fired the bullet that killed Officer Albidrez, and no other recovered weapon could have.  Following a brief surgery, Aranda was transported to the Webb County Jail, where he confessed to killing Officer Albidrez.  He also signed a written waiver of his *Miranda* rights.  As relevant to this appeal, he argues his waiver of his *Miranda* rights was not knowing and intelligent.

Both brothers were charged for the murder of Officer Albidrez.  Juan Aranda was tried first; he was found guilty and sentenced to life in prison. Arturo Aranda was tried next, and a jury found him guilty.  In the punishment phase of the trial, the jury sentenced Aranda to death.  Also relevant to this appeal, Aranda now contends that his trial counsel was ineffective for failing to investigate mitigating circumstances.

Arturo Aranda appealed, his conviction was affirmed, and the Supreme Court denied certiorari.  *Aranda v. State*, 736 S.W.2d 702 (Tex.

Crim. App. 1987) (en banc), *cert. denied*, 487 U.S. 1241 (1988). He filed a state post-conviction application, which was denied. Aranda then sought federal habeas relief. On April 20, 1989, Aranda filed his federal habeas petition. Following briefing, the district court granted summary judgment in favor of the State. Aranda moved for reconsideration, which the State opposed.

For reasons which are unclear from the record, Aranda's motion for reconsideration was not ruled on for nearly three decades. Eventually, the matter was reassigned, and the newly assigned district judge denied Aranda's motion. The district court declined to grant a certificate of appealability ("COA") as to any claims. On appeal, we granted a COA to consider two of Aranda's claims: (1) his *Miranda* claim and (2) his ineffective-assistance-of-counsel claim, both of which we address now.

## II

Because Aranda filed his initial federal habeas petition before the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), his claims are governed by the law as it existed before AEDPA. *Slack v. McDaniel*, 529 U.S. 473, 481 (2000). "Under pre-AEDPA standards of review, this court will review the legal conclusions of the district court de novo and the state court's findings of fact for clear error." *Kunkle v. Dretke*, 352 F.3d 980, 985 (5th Cir. 2003). "This court must accord a presumption of correctness to all findings of fact if they are supported by the record." *Id.* However, "[t]he pre-AEDPA standards do not require a federal court to defer to the state court's legal conclusions." *Id.*

## III

We granted Aranda a COA on two claims: (1) a *Miranda* claim, and (2) an ineffective-assistance-of-counsel claim. We examine each claim in turn.

### A.    The *Miranda* Claim

Aranda argues that his waiver of his *Miranda* rights was not knowing-and-voluntary, and therefore his confession was introduced in violation of his *Miranda* rights.  Specifically, he argues that his waiver could not have been knowing-and-voluntary because (1) he "did not understand" the English-language waiver form, (2) he had not recovered from surgery earlier in the day to knowingly and intelligently understand the consequences of his waiver, and (3) he did not know he was facing a capital murder charge.

Aranda's *Miranda* violation claim falls flat.  Aranda challenged his confession before the trial court and was offered a full and fair hearing by the court.  Although that hearing focused primarily on the voluntariness of the waiver, Aranda raised some of the same issues he does here, including his purported difficulties speaking English and his condition after surgery at the time of his interrogation.  But the trial court rejected these arguments, saying that it was "inclined to believe the peace officers and the District Attorney" and that "the statement will be admissible on the trial of the merits."  Although the trial court made few explicit findings of fact, its ruling (and comment that it believed the prosecution's witnesses rather than Aranda) necessarily implies that it found both that Aranda was either explained the form and his rights in Spanish or had sufficient grasp of English to waive his rights, and that Aranda's condition was not so poor after his surgery that he was incapable of waiving his rights.  *See Townsend v. Sain*, 372 U.S. 293, 314 (1963) (explaining that "if the state court has decided the merits of the claim but has made no express findings," a court may still "reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia").  The findings necessarily implied in the ruling are entitled to our deference.  *See* 28 U.S.C. § 2254(d) (1988); *see also Wainwright v. Witt*, 469 U.S. 412, 430–31 (1985) (explaining that a transcript

can satisfy the requirement of an "adequate written indicia" by a state court entitled to deference under § 2254(d)).

Nor can we say that such findings were unreasonable. The record is replete with evidence that Aranda had a working grasp of English and that he was explained his rights in Spanish. And although Aranda emphasizes the nature of his wounds at some length, there was significant testimony indicating that by the time of his interrogation he had sufficiently recovered and had a full understanding of the circumstances surrounding his interrogation. Finally, because the hospital records only demonstrate that Aranda was given pain medication around noon, reason dictates Aranda would likely no longer be under the influence of the drug by the time of his interrogation in the evening.

Finally, Aranda cites no authority for his proposition that a failure to advise him that he faced the death penalty prior to his confession constitutes a *Miranda* violation, and we decline to create such a novel rule here. Indeed, at oral argument, Aranda conceded that *Miranda* does not require that prior to issuing a waiver, the defendant be advised of the potential worst outcome. And both the Supreme Court and this court have intimated that no such rule exists. *See Colorado v. Spring*, 479 U.S. 564, 576 (1987) ("We have held that a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that might affect his decision to confess." (cleaned up)); *Vanderbilt v. Collins*, 994 F.2d 189, 197 (5th Cir. 1993) (explaining that "a knowing and voluntary waiver of *Miranda* rights does not require that the defendant understand every possible consequence of the decision to waive the right"). And as the State points out, such a rule would prospectively bind prosecutors' hands based on representations made (or omitted) by investigators, who lack the discretion to determine whether to seek the death penalty.

Moreover, the record indicates that Aranda was told that he was suspected of the murder of a police officer. He was thus—at a minimum— aware that he was suspected of a serious crime, and a reasonable individual, regardless of education, would have understood that the penalty for such a crime would be severe. In these circumstances, the failure to explain to Aranda precisely the consequences he may face for the crime he is accused of does not create a *Miranda* violation.

But even assuming that there was a *Miranda* violation, Aranda must demonstrate that it resulted in "actual prejudice" and "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Aranda fails to do so here, as the record demonstrates that any purported *Miranda* error was harmless. The State produced overwhelming evidence of Aranda's guilt. This evidence included the testimony of Officer Viera, who identified Petitioner in open court. It included significant ballistic evidence that Arturo Aranda's gun killed Officer Albidrez. And it included the testimony of Aranda's brother Juan Aranda, who described the gunfight with the officers.

Perhaps recognizing the voluminous evidence against him, Aranda strives to undermine the other evidence of his guilt. He first argues that Officer Viera's eyewitness account of the shooting should be completely disregarded because the "immense stress" caused by the gunfight renders Officer's Viera's account "inherently unreliable." But Officer Viera's testimony was unequivocal. Officer Viera was able to offer a detailed description of the events that unfolded on the morning of July 31, 1976. Officer Viera's testimony held up under cross-examination, and he was adamant that Aranda shot first. And Viera identified Arturo Aranda in open

court. This eyewitness testimony cannot be discounted based on after-the-fact speculation that stress renders it unreliable.[1]

Aranda's attempts to impugn the ballistics evidence against him are also faulty. At trial, a ballistics expert testified that Aranda's weapon could have fired the bullet that killed Officer Albidrez, and no other recovered weapon could have. Aranda first argues that there was "conflicting" evidence as to who possessed a .38 caliber handgun—which was identified as the murder weapon at trial—on the night of the shooting. But he points to no such conflicting testimony in the record. Moreover, the .38 caliber handgun was found on Aranda's person at the hospital.[2] Aranda asks us to disregard that evidence, too, with a conclusory argument that it is a "rather incredible scenario." But again, Aranda cites no evidence to draw that testimony into doubt. Finally, Aranda contends that the firearm toolmark evaluation used to analyze the gun found on Aranda's person was "not conclusive." But Aranda still fails to direct us to any record evidence demonstrating that the firearm toolmark evaluation was inconclusive. In

---

[1] Indeed, the primary support Aranda musters to support this argument consists of two nonbinding state-court cases. But these cases do not aid Aranda. In *People v. Lerma*, 47 N.E.3d 985, 993 (Il. 2016), the court listed stress as only one of several factors that can influence the reliability of eyewitness testimony. Other factors included "the wearing of partial disguises" and "cross-racial identification." *Id.* And in *State v. Guilbert*, 49 A.3d 705, 722–23 (Conn. 2012), the court only allowed for expert testimony regarding the unreliability of eyewitness testimony; it did not hold that all eyewitness testimony is inherently unreliable.

[2] That the handgun was found on Aranda's person at the hospital as opposed to at the scene of the crime is of no moment. As explained at oral argument, because the state prioritized getting Aranda into the ambulance and to the hospital, no thorough search of his person at the scene was conducted. Instead, the officers discovered Aranda laying on his stomach and conducted a cursory pat down of his back and sides. Only at the hospital did they conduct a more thorough search that revealed the location of the gun, Aranda's front waistband.

short, Aranda's arguments regarding the ballistics evidence are conclusory, speculative, and run against the weight of the record.

Finally, Aranda argues that his confession must have had a substantial influence on the jury's verdict because the prosecutor mentioned it in his closing. But Aranda's argument misses the mark, as the prosecutor actually minimized the importance of Aranda's confession in his closing argument. First, the prosecutor gave his initial closing argument in which he did not even mention the confession. Rather, it was Aranda's attorney who focused on the confession in his closing argument, in which he asked the jury to disregard the confession as he argued it was involuntary. When the prosecutor rose to rebut Aranda's closing, he stated that "[w]e didn't need that statement of Arturo's." The prosecutor then only briefly addressed Arturo's confession later, as his discussion of the confession comprises only about one page of eighteen pages of transcript of the prosecutor's rebuttal. Moreover, the prosecutor did not focus on the probative value of Aranda's confession; rather, he only briefly described why the confession was voluntary.[3] When viewed in context, the prosecutor's closing argument makes clear how *little* the prosecution relied on the confession relative to other evidence, including the ballistic evidence and witness testimony.

We remain cognizant that "confessions have profound impact on the jury." *Bruton v. United States*, 391 U.S. 123, 140 (1968) (White, J., dissenting). But the erroneous admission of a confession does not, in every case, constitute harmful error. Our precedents illustrate as much. *See Jones v. Davis*, 927 F.3d 365, 370–71 (5th Cir. 2019). Given the profuse amount of evidence presented against Petitioner at trial, we are convinced that the

---

[3] In addition, the court's jury charge regarding Aranda's confession directed the jury to examine the confession, determine its voluntariness, and reject the confession if it was not voluntary.

No. 20-70008

admission of the confession did not have "a substantial and injurious effect or influence" in the context of the trial as a whole. *Brecht*, 507 U.S. at 637.

### B.     The *Strickland* Claim

Aranda also argues that he was denied effective assistance of counsel in violation of the Sixth Amendment under *Strickland v. Washington*, 466 U.S. 668 (1984) and *Wiggins v. Smith*, 539 U.S. 510 (2003). Ineffective assistance of counsel claims are reviewed under *Strickland*'s two-prong test. First, Aranda must demonstrate that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687. To establish deficient performance, Aranda must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This is an uphill battle, as we apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As to the second prong, Aranda must demonstrate that that the deficient performance prejudiced the defense. *Id.* at 687. In a death penalty case, "the question is whether there was a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigation circumstances did not warrant death." *Id.* at 695. "Prejudice exists when the likelihood of a different result is 'substantial, not just conceivable.'" *Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir. 2013) (quoting *Harrington v. Richter*, 526 U.S. 86, 112 (2011)). We are also mindful that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

Aranda argues that his trial counsel was deficient for failing to adequately investigate evidence of mitigation to be used at the sentencing stage, including evidence that Aranda had a difficult upbringing or a possible

9

No. 20-70008

brain injury.[4]  When examining a failure to investigate, we are mindful that the Supreme Court has emphasized that "strategic choices made after less than complete investigation are reasonable precisely to the extent that professional judgments support the limitations on the investigation." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690–91).  And "we continue to extend highly deferential treatment to counsel's sentencing strategy and tactical decisions."  *Pape v. Thaler*, 645 F.3d 281, 292 (5th Cir. 2011).

With respect to investigating Aranda's personal background more generally, Aranda fails to show that his trial attorney failed to conduct an adequate investigation into Aranda's past.  Aranda argues that "had trial counsel conducted *any* investigation, Mr. Aranda's wife could have testified that Mr. Aranda always treated her and their children well, and that Mr. Aranda maintained that relationship with his children when he was imprisoned."  Aranda also argues that had trial counsel learned about Aranda's employment history, he could have put forth evidence that would "have further undermined, for example, the proposition that Aranda posed any danger within structured environments."

But the affidavit of Aranda's trial attorney, Larry Dowling, contradicts Aranda's argument that his counsel failed to make an adequate investigation into Aranda's background.  Rather, Dowling's affidavit makes clear that he

---

[4] At various points in his opening brief, Aranda seeks to make other arguments, including that Aranda's attorney was deficient for failing to "conduct voir dire in light of hostility towards Mexican Americans in Victoria" and that counsel "made no effort to look into the validity of [Aranda's rape] conviction."  We did not grant a COA on these claims and in fact explicitly denied a COA for many of these claims. *See Aranda v. Lumpkin*, No. 20-70008, 2021 WL 5627080 (5th Cir. Nov. 30, 2021).  Accordingly, we will not consider these claims, and limit out analysis to the single *Strickland* claim on which we granted a COA.

had extensive familiarity with Aranda's history and circumstances. Dowling's attested that he "knew that Mr. Aranda grew up in a poor family of many children in the barrios of San Antonio." Dowling also attested that his investigation had revealed that "[t]here was substantial evidence, notwithstanding his background, that Mr. Aranda was a nonviolent person," and that "there was available evidence that . . . [Aranda] demonstrated his ability and willingness to be a peaceable and cooperative prisoner." Although Aranda points to two categories of evidence from his background that he wishes his attorney had put forth at sentencing, the record as a whole, especially in light of Dowling's affidavit, does not evince a failure to investigate Aranda's background generally.

Indeed, the record reveals that Dowling in fact *did* do an investigation into Aranda's past circumstances, but he made the strategic choice not to put forth this evidence "because [he] believed the jury would not be able to consider such evidence as mitigating circumstances." And, as the Texas law stood at the time, he was correct. It would be another decade until the Supreme Court clarified that Texas courts must allow jurors to express a "reasoned moral response" to such evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989). Aranda's counsel was not constitutionally required to predict a significant change in the law. *Maryland v. Kulbicki*, 577 U.S. 1, 4 (2015). Indeed, we must be sure to consider a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," *Wiggins*, 539 U.S. at 523 (cleaned up), and make "every effort" to "eliminate the distorting effects of hindsight." *Strickland*, 446 U.S. at 689. Viewed properly, Dowling's decision not to introduce evidence of Aranda's background was a strategic choice which was "virtually unchallengeable." *Strickland*, 446 U.S. at 690. This claim therefore fails.

The record does, however, demonstrate one narrow area where Dowling made a less-than-complete investigation: evidence of Aranda's

head injury resulting from a police confrontation when he was sixteen. Dowling states that he "did not conduct any extensive investigation of Mr. Aranda's background for the purpose of developing specific evidence of disorders caused by his background." This decision is a "strategic choice[] made after less than complete investigation," which is "reasonable precisely to the extent that professional judgments support the limitations on the investigation." *Wiggins*, 539 U.S. at 528 (quoting *Strickland*, 466 U.S. at 690). We therefore must consider whether Dowling's decision to forgo a more complete investigation into Aranda's head injury is supported by professional judgment.

In his affidavit, Dowling explained his strategic decision to forgo an investigation into any disorder that Aranda may have. Specifically, Dowling was concerned that developing and presenting evidence of a disorder would open the door for the State to use psychiatrists to show that the disorder would make Aranda dangerous in the future, which was a consideration a Texas jury must have considered in imposing the death penalty. Dowling was also concerned that the risk of presenting evidence of a disorder was not worthwhile without a mitigating instruction, unless it was so significant that it could demonstrate that Aranda's crime was not "deliberate"—a very high bar. In sum, Dowling stated that "[i]n my opinion a responsible, competent trial lawyer would not take the risk of presenting such evidence without the assurance of a mitigation instruction." He further attested that "[b]ecause of the foregoing problems with developing and discovering evidence which mitigates 'blameworthiness' and because of the failure of Texas courts to instruct a jury on 'mitigation,' I would not, and in this case did not, develop evidence as to neurological, psychological, psychiatric or sociological reasons pertinent to the Defendant's ability to control his own behavior."

Dowling's well-reasoned explanation for his decision to forgo an investigation here is fatal to Aranda's *Strickland* claim. Based on the law as

it stood at the time of Aranda's sentencing, Aranda's counsel was reasonable to think that such evidence could well have backfired. These sentencing strategies and tactical decisions are beyond the reach of a *Strickland* claim.

We note that this case is different in kind from *Wiggins*. To be sure, in *Wiggins*, the Supreme Court held that an attorney rendered ineffective assistance of counsel by failing to investigate and present mitigating evidence of a capital defendant's background at the sentencing stage. 539 U.S. at 524. But the Court emphasized that counsel had not reasoned that a mitigation case "would have been counterproductive." *Id.* at 525. Here, because of the unique death penalty sentencing scheme Texas had in place at the time of Aranda's sentencing—a factor not present in *Wiggins*—Aranda's counsel expressed a reasonable concern that any additional investigation into Aranda's mental disorder could lead to evidence that would be counterproductive. In light of that serious concern, it was reasonable for Dowling to forgo additional investigation into the issue, because as the *Wiggins* court noted, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533.

Finally, Aranda argues that the district court made a legal error by imposing too high of a standard for his *Strickland* claim. Aranda contends that the district court required him to show that his trial counsel was "not functioning as counsel," rather than that his performance fell "below an objective standard of reasonableness." This argument is easily disposed of. First, the "not functioning as counsel" language was pulled directly from *Strickland*, which used that language to describe what constituted a deficient performance. 466 U.S. at 687 ("[T]he defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."). Indeed, we have repeated the exact language that

Aranda objects to, *Brooks v. Kelly*, 579 F.3d 521, 523 (5th Cir. 2009), and affirmed district courts that also applied this standard. *See Rabe v. Thaler*, 649 F.3d 305, 307 (5th Cir. 2011) (affirming a district court's finding that a trial attorney did not make "errors so serious that he was not functioning as counsel"). Second, a review of the trial judge's order denying Aranda's *Strickland* claim makes clear he was applying the proper standard. The trial court quoted *Strickland* at length, including the requirement that any deficiency be judged by an "objective standard." Third, even were there some gap between performance which "below an objective standard of reasonableness" and performance which demonstrated that an attorney was "not functioning as counsel," we are convinced that, for the reasons discussed at length above, the performance of Aranda's trial counsel did not fall below an objective standard of reasonableness.

## IV

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief and an evidentiary hearing.[5]

---

[5] An evidentiary hearing would not prove beneficial where: (1) the parties have not proffered any evidence that is disputed; (2) the evidence was appropriately presented during the state-court proceedings' and (3) Aranda has not identified any new evidence that could be developed if he were granted an evidentiary hearing at this juncture.