Baby Ray BENNETT, Applicant,

v.

James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. 6:89 CV 703.

United States District Court,
E.D. Texas,
Tyler Division.

May 6, 1994.

Michael R. Enwall, Boulder, CO, Corin W. McIlnay, Kobayashi & Assoc., Darrell Michael Daley, Rothgerber Appel Powers & Johnson, Joann Louise Vogt, Rothgerber, Appel, Powers & Johnson, Denver, CO, for applicant.

William Charles Zapalac, Asst. Atty. Gen., Atty. Gen. Office, Austin, TX, for respondent.

## MEMORANDUM OPINION

JUSTICE, District Judge.

### I. Background

Applicant, Baby Ray Bennett, is a thirty year old black male, who is currently on death row at the Ellis 1 Unit of the Texas Department of Criminal Justice—Institutional Division, in Huntsville, Texas. After an alleged attempt to plead guilty to first degree murder failed, applicant was tried, found guilty, and sentenced to death, in Case No. 3589, in the District Court of Newton County, 1st Judicial District of Texas, in November of 1985. A short recitation of the facts will suffice, as they are set forth in full detail in *Bennett v. State*, 742 S.W.2d 664 (Tex.Crim.App.1987). Applicant was in the process of stealing the decedent's truck when the decedent returned to his home. Applicant at that time shot the decedent, drove to Louisiana, and left the decedent, allegedly alive at the time, under a bridge.

The procedural posture of this case is set forth in full detail in this court's order of

October 28, 1993. *Bennett v. Collins*, 835 F.Supp. 930 (E.D.Tex.1993). A brief summary will be repeated here for the sake of clarity. After applicant was sentenced to death, he moved for a new trial; the motion was denied by the trial court. Applicant's conviction and death sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals. *Bennett v. State*, 742 S.W.2d 664.

Applicant thereafter petitioned the United States Supreme Court for the writ of certiorari. Upon granting the writ, the Supreme Court vacated applicant's death sentence, and remanded the case for further consideration in light of *Satterwhite v. Texas.*[1] *Bennett v. Texas*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988). The Texas Court of Criminal Appeals reexamined the case, but declined to engage in harmless error analysis, because it found that there had been no violation of applicant's Fifth or Sixth Amendment rights in connection with psychiatric testimony offered by Dr. Grigson during the sentencing phase.[2] Thus, the Texas Court of Criminal Appeals reaffirmed the original judgement, upholding the conviction as well as the death sentence. *Bennett v. State*, 766 S.W.2d 227, 231 (Tex.Crim.App.1989). Applicant again petitioned the United States Supreme Court for the writ of certiorari, but it was denied. *Bennett v. Texas*, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 578 (1989).

Applicant next filed an application for the writ of habeas corpus with the District Court of Newton County. The trial court denied the application and accompanying motions, without a hearing. The Texas Court of Criminal Appeals affirmed the trial court's dismissal as to all but one issue,[3] which was set for submission to the court without argument. The Texas Court of Criminal Appeals entered a written, unpublished order denying relief on the submitted issue. *Ex parte Bennett*, Application No. 70, 982 (Tex.Crim.App. 1991).

While the application was pending before the Texas Court of Criminal Appeals, applicant filed an application for the writ of habeas corpus with this court. On December 20, 1989, this court entered an order staying the proceedings pending exhaustion of all state court remedies. After the Texas Court of Criminal Appeals denied Bennett's application, applicant moved to set aside the stay entered by this court. On December 2, 1991, this court vacated the stay and granted applicant's motion to amend his original habeas application.

Applicant filed his amended application for the writ of habeas corpus on January 14, 1992. After significant delay, the respondent's answer was filed with the Clerk of the court on November 5, 1992.[4] This court held a hearing on the merits of the application for the writ of habeas corpus on December 6,

---

**1.** 486 U.S. 249 (1987) (finding that the admission of psychiatric testimony, derived from an examination which violated the defendant's Sixth Amendment right, is not harmless error unless the State proves beyond a reasonable doubt that the error complained of did not affect the ultimate verdict).

**2.** As required by Texas law, the same jury that found petitioner guilty of murder was asked to determine, in a separate sentencing hearing, whether the death penalty should be imposed. To obtain the death penalty in Texas, the state must prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.Proc.Ann., art. 37.071 sec. 2(b)(1) (West 1981).

**3.** The issue concerned applicant's claim that the Texas capital sentencing statute is unconstitutional, because it does not provide the jury with

adequate guidance concerning its ability to consider and act upon mitigating evidence.

**4.** In August of 1993, applicant filed a motion with this court demanding that the court find that, because of respondent's repeated delay, respondent had waived the procedural default defense. After careful reflection, the following order was entered:

The continued delay has forced the court to confront the reality of the present situation: despite repeated second chances by this court, including several extensions of time granted although the requests were filed in an untimely manner, respondent continues to flout the procedural requirements of the court. Such flagrant abuse of the system, resulting in numerous periods of delay, cannot be tolerated. Thus, it has been determined that due to respondent's extraordinary and repeated pattern of delay, rising to the level of *mora*, applicant's motion will be granted.

*Bennett v. Collins*, 835 F.Supp. at 934.

1993. After reviewing the state court record, and conducting an evidentiary hearing, it has been determined that the writ of habeas corpus shall be granted.

## II. Confession of Error in the Sentencing Phase

On the morning of the evidentiary hearing, the parties notified the court that an agreement had been reached with respect to most of applicant's claims. Several stipulations were filed with the court's approval.

In one of the stipulations, respondent confessed error in the sentencing phase of applicant's trial, agreeing that Dr. Grigson's testimony violated the standards set forth in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and its progeny. Respondent further stipulated that the error was not harmless under the standard of review announced in *Brecht v. Abrahamson*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (explaining that the proper standard of review for trial error is whether the error "had substantial and injurious effect or influence in determining the jury's verdict") (quoting *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).[5] Finally, the parties agreed that the confession of error would not be appealable by either party.[6]

Even if respondent had not confessed error, this court would have been obligated to grant the applicant relief based on reversible error during the sentencing phase of trial. In *Vanderbilt v. Collins*, 994 F.2d 189 (5th Cir.1993), the Fifth Circuit affirmed the grant of the writ of habeas corpus, by reason of error similar to the error in the instant matter. In *Vanderbilt*, the court held that the sentencing phase testimony of a psychiatrist regarding future dangerousness violated applicant's Fifth and Sixth Amendment rights, because neither applicant nor his attorney were notified that the psychiatrist

would be testifying as to future dangerousness. The court further found that the testimony had a substantial and injurious effect or influence in determining the jury's verdict, and thus constituted reversible error under the new standard enunciated by the Supreme Court in *Brecht*. In the present matter, Dr. Grigson failed to notify both applicant and his attorney that he would be testifying as to future dangerousness during the sentencing phase. Hence, applicant's Fifth and Sixth Amendment rights were violated. The error was not harmless, since Dr. Grigson's testimony was the primary evidence introduced during the sentencing phase, and the testimony had a substantial and injurious effect or influence in determining the jury's verdict during sentencing. Based on respondent's confession of error, and on Fifth Circuit precedent, the writ of habeas corpus vacating applicant's sentence of death shall issue contemporaneously with this order.

Having accepted respondent's confession of error in the sentencing phase of the trial, the remaining claims in Bennett's application will be addressed. The first to be considered is applicant's challenge to the jury selection; specifically, that several jurors were challenged solely on the basis of their race. Applicant's claim regarding the trial court's rejection of the plea bargain will be reviewed subsequently.

## III. The *Batson* Claim

### A. Legal Standards

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1985), the Supreme Court reversed the conviction of a defendant who had been convicted by a jury selected, in part, as the result of race-based preemptory challenges. The Court built on existing precedent, explaining that, because "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of

---

5. After reviewing the opinion of the United States Court of Appeals for the Fifth Circuit in *Vanderbilt v. Collins*, 994 F.2d 189, 198–99 (5th Cir.1993), it is apparent that Dr. Grigson's testimony was offered in violation of applicant's Constitutional rights, and that such error was harmful under the applicable standard of review.

6. Applicant also agreed to drop nearly all of his pending challenges to other errors at the sentencing phase. Applicant reserved the right, which he exercised during the hearing, to pursue claim A, a *Batson* claim, and claim T, dealing with a rejected plea bargain.

his race have been purposefully excluded," a defendant's rights are violated when peremptory challenges are made solely on the basis of race. *Id.* at 85, 106 S.Ct. at 1716 (citing *Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880)). *Batson* reiterated the holding of *Swain v. Alabama,* that the "State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." 380 U.S. 202, 203–04, 85 S.Ct. 824, 826–27, 13 L.Ed.2d 759 (1965). The Court has historically condemned the exclusion of black jurors solely on the basis of race, and *Batson* reaffirms the principle in holding that the Constitution prohibits race-based peremptory challenges.

■ In addition to reaffirming its commitment to non-discriminatory practices in jury selection, the *Batson* Court also provided the analytical framework which lower courts must use to evaluate claims of improper, race-based peremptory challenges during jury selection. Borrowing from Title VII employment discrimination doctrine, the Court explained that the burden of proof originates with the criminal defendant, who must make out a *prima facie* case of unlawful discrimination. If the defendant makes out a *prima facie* case of discrimination, the burden shifts to the State to come forward with a racially-neutral, non-discriminatory reason for challenging the venireperson. Should the State provide a legitimate, non-discriminatory reason for the peremptory challenge, the burden then shifts to the criminal defendant, who has the ultimate burden of persuasion, to show that the articulated reason is pretextual. *See Batson* 476 U.S. at 93–94, 106 S.Ct. at 1721–22 (citing *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

■ In order to make out a *prima facie* case, a defendant must first show that he or she is a member of a cognizable racial group, and further demonstrate that the prosecutor has exercised peremptory challenges in such a way as to remove members of defendant's race from the jury. *Batson,* 476 U.S. at 96,

106 S.Ct. at 1723. Finally, the defendant must make a showing that the facts and surrounding circumstances raise an inference that the prosecutor used the peremptory challenges to exclude venirepersons from the jury on the basis of race. *Id.* The Court provided several illustrative examples, including a " 'pattern' of strikes against black jurors, ... [and] the prosecutor's questions and statements during *voir dire,*" to explain what a lower court might consider in determining whether the defendant has made out a *prima facie* case. *Id.* at 97, 106 S.Ct. at 1723.

■ Once the defendant has made out a *prima facie* case, the State must come forward with a racially-neutral explanation for the peremptory challenge. The Court was careful to note that the prosecutor was not required to provide an explanation that would justify a challenge for cause. The Court explained, however, that a prosecutor could not satisfy the burden of proof merely by a general assertion of good faith and non-discriminatory motive. In other words, the prosecutor must articulate a "clear and reasonably specific" explanation of the "legitimate [race-neutral] reasons" for exercising the peremptory challenge. *Id.* at 98, 106 S.Ct. at 1724 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)).

The prosecutor having offered a race-neutral reason for the challenge, the trial court must evaluate the credibility of the parties in order to determine whether the reason articulated by the prosecutor is, indeed, legitimate and non-discriminatory, or if it is, in fact, pretextual.

■ Based on the Supreme Court's observation that the defendant in *Batson* had made a timely objection to the peremptory challenge, the Fifth Circuit has repeatedly held that in order to preserve the *Batson* issue for subsequent review, a defendant must make an objection at the time of jury selection. *Wiley v. Puckett,* 969 F.2d 86 (5th Cir.1992); *Wilkerson v. Collins,* 950 F.2d 1054 (1992); *Jones v. Butler,* 864 F.2d 348, 369 (5th Cir.1988). This rule is based on the fact that a trial judge must make a credibility

determination, giving consideration to all of the surrounding circumstances. The Fifth Circuit has expressed concern that the passage of time undermines such a determination. *Wilkerson,* 950 F.2d at 1063. Thus, if a defendant fails to object at the time of jury selection, the state may later object to a court's consideration of a *Batson* claim by asserting what is known as the procedural default defense. This defense has typically been negated by a showing of certain extenuating circumstances. *See, e.g., Tasco v. Butler,* 835 F.2d 1120, 1122 (5th Cir.1988) (holding that the federal habeas corpus court could reach the merits of a due process claim, even though there was no contemporaneous objection in state court trial, where the state habeas corpus court reached the merits rather than rely on the procedural default defense).

The Fifth Circuit has explained that traditional exceptions to the procedural default are not applicable in a *Batson* claim. *Wiley,* 969 F.2d at 101 (holding that a showing of cause and prejudice fails to overcome a defendant's initial failure to object). The cases in this line of precedent address situations in which the court was asked to review a *Batson* claim, despite the government's proper invocation of the procedural default defense. The Fifth Circuit has rejected arguments contending that the procedural default should not apply, notwithstanding the presence of such defects as an inconsistency in the state court system,[7] the lower court's review of the *Batson* claim,[8] or a showing of cause and prejudice.[9]

7. *Jones v. Butler,* 864 F.2d 348 (5th Cir.1988).

8. *Wilkerson v. Collins,* 950 F.2d 1054 (5th Cir. 1992).

9. *Wiley v. Puckett,* 969 F.2d 86 (5th Cir.1992).

10. *See supra* note 4.

11. In this court's prior order, the following analysis resulted in the holding that waiver of the defense was proper:

In the present case, equity suggests that the motion for waiver should be granted. Applicant's motion asks the court to deem the procedural default defense to be waived. In essence, the court must decide whether it would make sense to permit the respondent to use a

■ Although applicant failed to object to the peremptory challenges at the time the jury was selected, this line of cases is not controlling in the instant action, inasmuch as this court has previously adjudged the respondent's procedural default defense to have been waived.[10] In addition, unlike many of the prior cases, this is *not* a case in which "[e]quity does not require that those who did not object benefit from *Batson's* new evidentiary standard." *Jones,* 864 F.2d at 370. This court previously reviewed the equity of permitting applicant to proceed on his claims, despite his failure to object at trial, and determined that equity favored the waiver of the procedural default defense.[11] Thus, because existing precedent does not govern the present matter, and because equity weighs in favor of applicant having his *Batson* claim considered, it will be reviewed on the merits.

## B. Analysis

As already set forth, in order to pursue a *Batson* claim, applicant must first make out a *prima facie* case of discriminatory action. Applicant can easily satisfy the first two elements of his *prima facie* case. Applicant is black, and thus a member of a cognizable racial group. The prosecutor used five peremptory challenges to remove five black venirepersons, the only blacks remaining after the prosecutor and judge had removed the other seven for cause, thereby removing from the final jury all members of applicant's

defense which prohibits the court from reaching the merits of applicant's case because the applicant failed to comply with the procedural requirements, such as the contemporaneous objection rule, when respondent has itself not complied with procedural requirements of this court. In this case, respondent is complaining about behavior on the part of the applicant which is similar to its own behavior. No reason for permitting respondent to proceed with the procedural default defense can be perceived in light of respondent's continued refusal to comply with the procedural requirements in this court. It would be nonsensical to hold applicant, an indigent prisoner on death row, with court-appointed trial counsel, to a higher standard than that to which we hold respondent, the State of Texas, with all of its intellectual and financial resources.
*Id.*

race. The final component of the *prima facie* case requires applicant to demonstrate that the facts and surrounding circumstances raise an inference that the prosecutor used the peremptory challenges to exclude venirepersons from the jury on the basis of race.

## 1. Applicant's *Prima Facie* Case

■ In the instant case, applicant has asserted the following facts: 1) applicant is black and the victim was white; 2) twelve of the sixty-seven venirepersons were black, but the jury that was seated was composed entirely of whites; 3) the 1980 Census shows that, at the time of trial, the population of Newton County was approximately 24% black; 4) the prosecutor challenged five of the black jurors for cause, over the objection of the defendant; [12] and 5) the prosecutor used five peremptory challenges to remove all of the blacks from the jury who had not previously been challenged for cause. Additionally, it is noted that several of the jurors were challenged for cause, even though they answered questions the same way as white venirepersons who were actually seated on the petit jury.[13] Finally, a review of the questions and statements during *voir dire* suggest that the prosecutor assumed that the black venirepersons would identify and sympathize with the applicant.[14] The prosecutor's pattern of challenging blacks, together with his statements during *voir dire*, and, as well, the ultimate composition of the petit jury, raise an inference of discriminatory motive and actions in the prosecutor's exercise of peremptory challenges. Thus, applicant has made out his *prima facie* case, and the burden shifts to respondent, to show that the

prosecutor had legitimate, race-neutral reasons for using peremptory challenges to remove each of the four black venirepersons from the final jury.[15]

## 2. The State's Asserted Race–Neutral Reasons

The respondent has proffered seemingly race-neutral reasons for each of the peremptory challenges that applicant disputes. These reasons were elicited when applicant deposed the prosecutors in his case, specifically asking of them the reasons for each of the challenges.

### *Lucial Alfred*

■ The prosecutors stated that Lucial Alfred was excused by reason of the fact that she knew the applicant's mother quite well, and had been associated with her socially. *See Martin Deposition* at 65–66; *Mitchell Deposition* at 86–87. Further, the prosecutors explained that Alfred was challenged because one of the defendant's lawyers had represented her (or possibly her husband) in a Social Security matter. *Martin Deposition* at 65–66; *Mitchell Deposition* at 86–87. Finally, the prosecution relied upon Alfred's statement that she could not conceive of any evidence which would make the death penalty necessary, contending that she thus expressed hesitancy about the death penalty. *Martin Deposition* at 65–66; *Mitchell Deposition* at 86–87. These reasons, that she was a friend of the defendant's mother, that she had been represented by the defendant's lawyer, and that she could not impose the death

---

12. These five challenges for cause were raised in Bennett's application for the writ, but this issue was dropped as part of the agreement entered into on December 6, 1993. One of the other blacks was removed by consent of both parties. The final black venireperson was removed over defendant's objection, because she had been present in the courtroom during another person's *voir dire*.

13. *See* Record, Vol. V, p. 255; Vol. VI, pp. 343–46, 431; Vol. VII, pp. 748, 752–54; Vol. IX, p. 755.

14. For example, in questioning one of the black venirepersons, the prosecutor posed the following question:

Are you going to visualize yourself in his place and not listen to the evidence and worry about the fact that you're both of the same race and not be fair and impartial in this case?
Record, Vol. VIII, p. 709.
No similar race-related questions were asked of white venirepersons.

15. Applicant challenges the removal of Lucial Alfred, Lyndon Bryant, O.J. Spikes, and Lavenia Thorn. Applicant does not dispute the preemptory challenge used to remove Josephus Holloway.

penalty, appear to be legitimate, race-neutral reasons for challenging Alfred.

### Lyndon Bryant

■ The prosecutors explained that they challenged Lyndon Bryant because one prosecutor, Bill A. Martin, knew Bryant and did not think he would make a good juror for the state. *Martin Deposition* at 68. Respondent also asserts that the prosecutors determined that Bryant would be unable to assess the death penalty, based on his answers to questions about potential penalties. *Mitchell Deposition* at 89. Moreover, respondent suggests that the prosecutors challenged Bryant, by reason of their opinion that he would be too easily swayed by other jurors, as indicated by his statement that he "could consider life . . . or whatever the penalty the jury decides." Record VIII at 703. Finally, the prosecutors challenged Bryant, purportedly because "he identified very much with the defendant on the trial," *Mitchell Deposition* at 89, when he remarked that, " 'I could be in his shoes.' " *Id.* Respondent has thus come forward with apparently legitimate, race-neutral reasons for challenging Bryant.

### O.J. Spikes

■ Respondent claims to have challenged O.J. Spikes for three reasons. First, he was challenged because his grandmother had worked for one of the defense attorneys. *Mitchell Deposition* at 83. Second, Spikes was challenged by reason of their belief that he lied when questioned as to whether any of his family had been charged or convicted of a crime. *Martin Deposition* at 64–65.[16] Third, the prosecutors decided, after speaking with people in the community, that Spikes would not be a strong juror for the state. Hence, respondent has articulated apparently legitimate, race-neutral reasons for exercising a peremptory challenge against Spikes.

### Lavenia Thorn

■ Finally, the prosecution challenged Lavenia Thorn. She was challenged primarily because her husband, and on occasion she, herself, had worked for a Mr. Lucas, who was a close friend of Shelley Hilliard, one of the defendant's lawyers. *Martin Deposition* at 69; *Mitchell Deposition* at 90–91. The prosecutors also challenged Thorn, for the reason that she stated she had not given any thought to the death penalty; and there was concern that she might not be able to impose it even if the facts presented justified its imposition. *Mitchell Deposition* at 90–91. Although the proffered explanations are weak, respondent has once again come forward with ostensibly legitimate, race-neutral reasons for the exercise of a peremptory challenge against Thorn.

### 3. Pretext

Having articulated seemingly legitimate, race-neutral explanations for each of the peremptory challenges contested by the applicant, the credibility of the proffered race-neutral explanations must be assessed. The applicant has pointed out several alleged inconsistencies in the actions of the prosecutors. A careful and critical review of these inconsistencies, combined with the elements of the *prima facie* case, suggest that the reasons asserted by respondent are pretextual, and that the true reason at least three of the four venirepersons were challenged lies in the fact that they are black.

### Lucial Alfred

■ The prosecutors' notes indicated that Alfred was "good friends" with the applicant's mother. This is the first reason offered by respondent for challenging her. The deposition testimony of the prosecutors reveals that, although neither claimed that Alfred was "good friends" with the applicant's mother, then-District Attorney Martin stated that Alfred "quite well knew this mother and had been associated with her

---

**16.** The deposition testimony of the prosecutors is somewhat vague, but it seems that there are two Spikes families in Newton County. Martin knew that some people by the name of Spikes had been charged with a crime, and he thought those people were related to Spikes. Mitchell seems to have relied primarily on Martin's information, but stated that he independently thought, but did not know, that Grady Spikes, who had been "in the pen a couple of times," was related to O.J. Spikes. *Mitchell Deposition* at 83–85.

socially." *Martin Deposition* at 65. The Assistant District Attorney Mitchell asserted only that "she [Alfred] knew his [applicant's] mother socially." *Mitchell Deposition* at 86. Comparing the deposition testimony of the prosecuting attorneys with the transcript of the *voir dire* of Alfred reveals that the relationship was significantly more casual than has been represented. During the *voir dire,* the following exchange occurred:

Q You don't know any of the defendant's people, like his mother, or anything of that nature?

A Yes.

Q You do know his mother?

A Yes, I know his mother.

Q You go to church with her or something?

A No.

Q Did you ever go to school, how did you happen to know her, just to put it—Just happen to meet her and have know her for years?

A Just happened to meet her.

Q And have you known her quit [sic] a long time?

A I'll say maybe seven or eight years.

Q Was it in connection with any social event or anything of that nature?

A *A* social event. [Emphasis added.]

Q Have you ever visited her home or she visited yours?

A No.

Q Is this a close, friendly relationship with his mother?

A No.

Record, Vol. VI, pp. 374–75.

Based on the questioning during *voir dire,* it appears that Alfred knew the defendant's mother, but they do not appear to have been "good friends," or to have known each other "quite well." Alfred unequivocally stated that the relationship was not a close, friendly one; the women had never visited in each other's homes. Rather, it would seem that the two women were acquainted in the way that many people in a small community are acquainted; *i.e.,* they had met on one occasion at a social event, and knew each other's name or face. It is unclear whether this sort of casual acquaintance would necessarily affect a juror's ability to be fair in a case. The prosecutor, however, asked Alfred if her relationship with the defendant's mother would hinder her ability to make a fair decision:

Q And let me ask you this, Mrs. Alfred, would this make a difference—well, it might make a difference, but could you make a decision in this case based on the acts and the facts alone, or would you be embarrassed or have problems making a decision finding this man, for instance, guilty and assessing a death penalty in this case, knowing the mother?

A No, I wouldn't.

Q Okay. Then, I'll go a little further into the case.

Record, Vol. VII, pp. 375.

Thus, when asked if she would have a problem being fair because of her acquaintance with the defendant's mother, Alfred answered that she would not. The first reason asserted for challenging Alfred, based on her casual acquaintance with the defendant's mother, that she, the venireperson, claimed would not affect her decision, is highly questionable. Newton, Texas, is a small community. The defendant is one of sixteen children. To exclude everyone in the community who knew someone in applicant's family, regardless of how casual the acquaintance might be, would have the impermissible effect of excluding a disproportionate number of blacks. *See Hernandez v. New York,* 500 U.S. 352, 363–64, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991) ("'An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.'") (quoting *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976)).

The second reason advanced for challenging Alfred is that she, or her husband, had been represented by Shelley Hilliard, Esquire, one of the defendant's attorneys. Martin recalled that Hilliard had represented her in a Social Security hearing. *Martin Deposition* at 65. Mitchell explained that Hilliard had recovered some Social Security

benefits for either "her or her husband." *Mitchell Deposition* at 86. During her *voir dire,* Alfred told the prosecutors that Hilliard had helped her husband get Social Security benefits. She explained that there was no lawsuit, and no hearing. Record, Vol. VI, pp. 375–76. When questioned as to whether her husband's former representation would affect her during the case, she said that it would not. *Id.*

While it is reasonable to believe that former representation by an attorney in the case might bias a juror in some way, the prosecutors appear to have been unconcerned about instances of prior representation with respect to several white venirepersons who were seated. In fact, three white venirepersons who were chosen to serve testified during *voir dire* that Hilliard had represented them personally,[17] as opposed to representing a spouse, as in the case of Alfred. Mary Voisin testified that Hilliard had represented her in an adoption some five or six years previously. Record, Vol. V, pp. 252–53. When questioned about whether her representation by Hilliard would affect her ability to decide the case, she, like Alfred, answered that it would not. *Id.* Mrs. William E. Barrow testified that Hilliard had represented her in the "sale of our house or something like that." Record, Vol. V, p. 296. She, too, stated that her acquaintance with Hilliard would not affect her deliberations as a juror. *Id.* Finally, Billy Blakeney testified that Hilliard had prepared deed transfers for him on two occasions, once "in the summer of this year." Record, Vol. VI, p. 385. Blakeney, like Alfred, Voisin, and Barrow, maintained that his decision would not be influenced by his acquaintance with Hilliard. Only Alfred was challenged by reason of Hilliard's former representation of her husband; each of the three white venirepersons was seated on the jury. That Alfred was challenged, while the three white venirepersons offering virtually identical answers to the questions posed to Alfred were seated, raises serious questions as to the verity of the proffered reason for challenging her.

The final reason given for exercising a peremptory challenge against Alfred is that she "could not conceive of a case where the death penalty would be appropriate punishment." Record, Vol. VI, pp. 380–81. When the prosecutor asked Alfred if she could conceive of a situation in which she would consider the death penalty, she responded that she did not understand the question. *Id.* The prosecutor then posed a hypothetical, and asked her if she would consider the death penalty in that situation; she said she would. *Id.* The prosecutor continued to question Alfred, inquiring whether she was against the death penalty. She said that she was not. *Id.* He then asked what facts she would require to give the death penalty, but the court found that the question was repetitive, since the juror had already qualified as believing in the death penalty. *Id.* at 382–83. A careful reading of the record reflects that Alfred simply could not articulate a set of circumstances in which she thought the death penalty would be appropriate. Thus, in the stressful and tense atmosphere of a *voir dire* in a capital murder case, all Alfred failed to do was conceptualize and articulate a set of facts that, in her mind, would justify the death penalty.

Several other venirepersons were similarly unable to give expression to circumstances in which the death penalty would be the appropriate punishment. For example, when asked what kind of evidence he would need to decide that the death penalty was justified, James Hancock responded:

> Well, I—you know, I don't know how to answer that, for the simple reason I just don't—I don't think I could say it's just one thing that would cause me—that would make me do it or keeps me from doing it. It would be, I feel like, something that each thing would just stand on the evidence you hear.

Record, Vol. VIII, pp. 722.

Although Hancock, a white man, was unable to describe a set of facts which, subjectively, would make the death penalty the proper punishment, he was seated on the jury.

---

**17.** It is not surprising that Hilliard had represented so many of the venirepersons, since he was one of only three attorneys practicing in Newton, Texas, at the time of the trial.

Additional testimony of Mary Voisin reveals substantial misgivings regarding the death penalty:

Q Could you vote for the death penalty in a case?

A No, sir.

Q Can you conceive of any situation, no matter how bad it might be, that you could vote for the death penalty?

A No, sir.

. . . . .

Q Are you totally against the death penalty under any circumstances?

A Yes, sir.

Q And would it influence you no matter what the evidence might be?

A Yes, sir.

Record, Vol. V, p. 255.

After this exchange, the prosecutors challenged Voisin for cause. The defense counsel and the judge questioned Voisin. She explained that she would be able to follow the court's instructions, and answer the special questions, despite the fact that certain answers would result in the death penalty. *Id.* at 258–60. Once it was clear that, although she could not "vote for the death penalty," she could answer the special questions, the prosecution accepted her as a juror. *Id.* at 265. While Alfred was unable to verbalize a hypothetical situation in which she would impose the death penalty, she never equivocated in her support for the death penalty. In striking contrast, Voisin stated, in no uncertain terms, that she could not vote for the death penalty. Her answer was qualified, in that she explained that she could answer the special questions that might result in the death penalty. Comparing the testimony of Alfred and Voisin, it would be reasonable to expect that Voisin, and not Alfred, would be challenged—if not for cause, then with one of the prosecutor's peremptory challenges. Nevertheless, seemingly without regard to the testimony given by these two prospective jurors, it was Alfred, and not Voisin, against whom the prosecutor exercised a peremptory challenge.

A third juror also expressed misgivings about the death penalty, and was unable to give expression to a situation in which the death penalty would be the proper punishment. Barrow, mentioned above, explained that she had mixed feelings about the death penalty; that she had not thought about it much; but she thought she could give it, if necessary. Record, Vol. VI, pp. 303. The prosecutor then asked her what factors would cause her to give the death penalty. She said it would depend on the facts of the case, what happened, and how it was done. When the prosecutor asked what sort of factors would be important in her decision, she said that she did not know how to tell him. *Id.* at 306–07. Barrow, like Alfred, was unable to verbalize or formulate situations or facts that would lead her to impose a death sentence. Unlike Alfred, Barrow, a white woman, was seated on the jury.

■ Respondent's reasons for challenging Alfred do not withstand close scrutiny, for the evidence demonstrates that the asserted reasons for challenging her are pretextual. Hilliard had represented Alfred's husband at one time; but Hilliard had also represented three white jurors who *were* seated. Alfred was unable to impart or express facts that would cause her to be in favor of the death penalty; but, two other white venirepersons had similar difficulties (one of whom appeared to be opposed to the death penalty), and they were seated. Finally, Alfred knew the applicant's mother. This casual acquaintance, which Alfred said would not bias her decision, does not alter the analysis. The reasons professed by the prosecutors for the peremptory challenge against Alfred are simply not credible. She was not seated on the jury, although she offered the same answers to the same questions posed to white venirepersons who *were* seated on the jury. As will become clear, these reasons become even less believable, when the pattern of challenges against each of the black venirepersons emerges.

### Lyndon Bryant

■ Two of the four proffered reasons for challenging Lyndon Bryant appear, upon close inspection, to be legitimate. First, The prosecutors were concerned that Bryant would be easily swayed by other jurors.

They based their decision on an exchange focussed on Bryant's ability to assess the death penalty. After several questions about whether he could give the death penalty, or five years, or ninety-nine years, Bryant responded that he "could consider life, yes, you know, or whatever the penalty the jury decides." Record, Vol. VII. p. 703. The prosecutor then assured him that that was all he wanted to know, at which point Bryant responded "Yes, sir, I go along." *Id.* Given this response, the prosecutor was concerned that Bryant would not assert his own position, but, instead, would "go along" with what other jurors wanted to do. Applicant has not pointed to anything to suggest that this reason is pretextual, aside from the state's use of peremptory challenges against other venirepersons, like Alfred. Thus, the state's ostensibly legitimate reasons will be accepted by the court.

■ In addition, the prosecutors challenged Bryant because one of them, Martin, knew Bryant. Based on his own personal knowledge, in addition to information he gathered from others in the community, Martin determined that Bryant would not be a strong juror for the state.[18] *Batson,* and subsequent cases interpreting *Batson,* make it clear that a prosecutor is not required to specify a reason that would lead to a challenge for cause; any reason other than race will satisfy the *Batson* inquiry. Hence, although this reason is admittedly weak, especially in the context of a jury selection in which several jurors were challenged solely because of their race, the applicant has not demonstrated that this reason is pretextual, and it is found that no error was committed when the state exercised a peremptory challenge to remove Bryant from the jury.[19]

### O.J. Spikes

■ Respondent has offered three reasons for exercising a peremptory challenge against O.J. Spikes. After careful consideration of the reasons advanced by respondent, as well as the applicant's contentions, it has been determined that the reasons are pretextual. It is first submitted that Spikes was challenged because his grandmother had

---

**18.** This reason is accepted, but only to the extent that the prosecutors relied on their own personal knowledge of Bryant. Vague suppositions of unidentified members of the community cannot be given any weight.

**19.** It must also be pointed out that the state also offered two reasons which appear to cast substantial doubt on the legitimacy of the reasons discussed above. The state maintains that Bryant was challenged because he expressed an unwillingness to assess the death penalty. This position is highly questionable, for two reasons. First, the state also claims they challenged Bryant in that he would just "go along" with other jurors. The opinion that Bryant would not agree to the death penalty, and the belief that he would just "go along" are inconsistent. Seemingly, one who is adamant in his or her opposition to capital punishment is unlikely to "go along" with a sentence assessing the death penalty. In addition, the answers given by Bryant are not substantially different from those given by other, white, venirepersons who were ultimately seated on the jury panel. A detailed analysis of the reasons given by Bryant in comparison with those of other, seated jurors will not be conducted. Instead, attention is directed to the discussion relating to Alfred, which rejects a similar explanation based on a comparative analysis. *See supra* at 580–581.

As a final reason for challenging Bryant, respondent argues that he identified too closely with the applicant. Bryant voluntarily stated that he "could be in his shoes." Record, Vol. VII, p. 708. During the state's re-examination, Bryant was asked, "Are you going to visualize yourself in his place and not listen to the evidence and worry about the fact that you're both of the same race and not be fair and impartial in this case." *Id.* at 709. While this question suggests that the prosecutor was apprehensive that Bryant would be unable to be fair since he, like the applicant, was a young black man, this concern is justified by reason of Bryant's comment that he could be in the applicant's shoes. It is critical to this analysis that the prosecutor did not elicit this comment by asking Bryant leading questions, but, rather, responded with follow-up questions after Bryant voluntarily commented on his identification with the applicant.

The two reasons offered for the challenge to Bryant are troubling, because (1) they independently suggest that the prosecutors did not believe that a black person would be incapable of fairly assessing the evidence, and hence unable to give the death penalty even if it was warranted, and (2) they fit with the overall pattern of striking all of the blacks from the jury panel. Nevertheless, these concerns are not outweighed by the other two asserted reasons. Because the applicant has the burden of proving that the state's proffered reasons are pretextual, and taking into account that the applicant has not met his burden with this venireperson, the reasons are accepted, although with misgivings.

worked for one of the defense attorneys, Hilliard. As the applicant points out, Newton is a small community and Hilliard was one of a small number of attorneys in the community. Under these circumstances, it is not surprising that Spikes was acquainted with Hilliard. In fact, many of the venirepersons knew Hilliard. Several had employed him as an attorney. At least three white venirepersons who had been represented by Hilliard were seated on the petit jury. *See supra* at 579–580. Finally, when the prosecutor asked Spikes if his acquaintance with Hilliard would affect his service as a juror in the case, Spikes maintained that it would not. Record, Vol. V, p. 265. The contention that Spikes was challenged because of his acquaintance with Hilliard is not credible in consideration of the fact that several white persons on the jury had even closer relationships with Hilliard. Moreover, the proffered explanation is implausible, given Spikes' statement that he would not be affected by this acquaintance.

Another reason for exercising a peremptory challenge against Spikes, respondent argues that Spikes lied when asked whether he had a family member who had been arrested or convicted of a crime. Applicant correctly notes that no statements during *voir dire*, or in the deposition testimony of the prosecutors, indicate that Spikes was lying when he said no family members had been arrested or convicted of a crime. When questioned during depositions, Martin explained that, based on personal knowledge, he thought one or more of his relatives had been convicted of a crime based on something someone told him; or that he, Martin, might have prosecuted and convicted a relative himself. (Martin Deposition at 64). He also explained that there were two Spikes families in Newton County, and that he thought O.J. Spikes lived in the north part of the county. *Id.* He was unable to name any particular members of the family who had been charged or convicted of a crime. Mitchell's testimony was even

more vague. Mitchell explained that he thought Spikes was a member of the Spikes family that lived in a particular area of the county. When asked how he knew this, he said he did not know the area or the people as well as Martin did. (Mitchell Deposition at 84). He also alleged that a man by the name of Grady Spikes had been in jail; but, he did not know if Grady Spikes was related to O.J. Spikes, nor did he ask O.J. Spikes if the two were related. *Id.* at 84–85. The prosecutors have not pointed to anything to suggest the reasonableness of their conclusion that Spikes lied when asked if he had any relatives charged or convicted of a crime.[20] The complete lack of a factual basis for this conclusion indicates that, like many of the other reasons set forth in respondent's pleadings, the avowed reason is a mere pretext for the true reason the prosecution exercised a peremptory challenge against Spikes.

The final reason offered for the peremptory challenge is the weakest of the three. The prosecutors contend that, based on conversations with unidentified people in the community, they determined that Spikes would not be a particularly strong juror for the state. The prosecutors are unable to point to any particular conversation to support their position. This vague, unsupported assertion is not credible, taking into account the surrounding facts and circumstances.

The most telling interchange during the *voir dire* of Spikes was a question posed during the state's re-examination. After discussing Spikes' work and living situation, the prosecutor asked:

Q Okay. Mr. Spikes, as you can see, the defendant is a young black man, you realize that?

A Yes.

Q Do you have any difficulty in handing down a death sentence against another young black man?

---

**20.** It is unclear whether the prosecutors contend that they challenged Spike because he lied when questioned about the criminal history of family members, or whether they challenged him because they thought he had family members who had criminal records. The former, and more

likely interpretation, is discussed above. The latter argument is clearly pretextual, since a white venireperson, Mr. Singleton, was seated on the jury after disclosing that he had a nephew who had gotten in trouble for writing hot checks. Record, vol. V, p. 219.

584

A No, sir.

Record, Vol. V, p. 275.

This question, which was not a reasonable follow-up to any statement by Spikes,[21] indicates that the prosecution saw Spikes not as an individual eligible to serve on a jury, but, rather, as a black person who inevitably would be biased in favor of the defendant. The applicant does not argue, and it is not found, that this question was *per se* improper. It does, however, demonstrate that the prosecution was particularly anxious about the race of the potential jurors. Having considered the *voir dire* of Spikes, along with the deposition testimony of the prosecutors, it is evident that the reasons offered for peremptorily challenging Spikes are pretextual.

### Lavenia Thorn

■ Two reasons have been asserted to explain the exercise of a peremptory challenge against Lavenia Thorn. The first of the two reasons, that Thorn was "close personal friends of one of Bennett's attorneys," is, in actuality, a misrepresentation of the prosecutor's explanation. Both prosecutors testified during their depositions that Thorn's husband had worked for a close personal friend of the defense counsel, Hilliard. (Mitchell Deposition p. 90; Martin Deposition p. 69) Some uncertainty exists as to whether she, Lavenia Thorn, had also worked for Hilliard's friend, although she was not questioned on this subject during *voir dire*. Her relationship—as an employee or spouse of an employee of a friend of Hilliard's—is substantially more attenuated than the relationship between Hilliard and several of the white jurors who were his former clients. *See supra* at 580–581. Assuming, *arguendo*, that Thorn had herself worked for the friend, it appears highly unlikely that such relationship would be sufficient to bias her as a juror. Hence, this explanation will not be accepted.

The prosecutors both noted that they also challenged Thorn because she said she had

not given much thought to the death penalty. When first questioned by the prosecution, Thorn unequivocally stated that she would be able to give the death penalty. Record, Vol. VIII, p. 727. The defense later questioned her about her view on the death penalty. She said that she had not made up her mind on the death penalty, but that she could give it if the defendant were found guilty. *Id.* at 737. During the state's re-examination, Thorn stated that she had never given much thought to whether she could give the death penalty; however, since she had been questioned, she had decided that if the facts showed that the defendant were guilty, she could give the death penalty. *Id.* at 740–41.

Thorn's testimony suggests only that she had not developed a fully reasoned opinion concerning the propriety of the death penalty. At no time did she say that she would not be able to assess the death penalty if the defendant were found guilty. Her testimony, and the accompanying peremptory challenge, is particularly questionable when it is compared to the statements of several white venirepersons who expressed serious uncertainty about capital punishment, but were, nonetheless, seated on the jury. *See supra* at 580–581 (discussing testimony of Barrow and Voisin). The reasons presented cannot be credited, in view of the responses of white jurors who were seated, as well as the prosecution's conspicuously manifest pattern of challenging all black venirepersons.

### C. Conclusion

Applicant has made out a *prima facie* case. He also has presented substantial evidence which supports his claim that the reasons submitted by the respondent for challenging several of the black venirepersons are pretextual. He has succeeded, therefore, in showing that Alfred, Spikes, and Thorn were excluded from his jury solely because of their race.[22]

In the instant action, as in *Batson* itself, the prosecutor used peremptory challenges to remove all of the black venirepersons who

---

**21.** The question posed to Spikes is easily distinguished from the question posed to Bryant, who invited the question when he volunteered that he could be in the applicant's shoes.

**22.** Applicant has not demonstrated that Bryant was excluded solely because of his race.

had not previously been challenged for cause, and a jury composed only of white persons was seated. "More than a century ago, the Court decided that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1985) (quoting *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880)). The procedures mandated in *Batson* have been complied with. Applicant has made out a *prima facie* case of discrimination; the state has come forward with ostensibly race-neutral reasons for the challenges; applicant has demonstrated that the proffered explanations are pretextual, and that, in fact, the state purposefully excluded several black venirepersons from the jury. Because applicant's constitutional rights were violated when the prosecution exercised peremptory challenges against three black venirepersons, solely on the basis of race, precedent requires that the writ of habeas corpus be granted, and that his conviction be vacated.[23] The writ of habeas corpus vacating applicant's conviction shall issue contemporaneously with this order.

## IV. The Plea Bargain

 Applicant seeks specific performance of an alleged plea bargain agreement between himself, his attorney, and the prosecutor. In this regard, applicant maintains that Judge Lawlis accepted the plea bargain, and thus the state must honor it. However, applicant has not presented any credible evidence that the plea agreement was actually accepted by Judge Lawlis. A plea bargain is a "contract" between the defendant and the prosecutor, but the "contract" does not become operative until the court announces it will be bound by it. *Thi Van Le v. Perkins*, 700 S.W.2d 768, 774 (Tex.App.—Austin, 1985,

orig. proceeding), *mand. denied. Perkins v. Court of Appeals for the Third Supreme Judicial District of Texas*, 738 S.W.2d 276 (Tex.Crim.App.1987). Although applicant claims a breach of the plea bargain, it was never accepted by a judge. In the absence of the judge's approval of the alleged plea bargain, it was not binding on the parties, and applicant simply is not entitled to its specific performance. *Cf. Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (holding that the state is bound to carry out its side of the bargain once the court accepts a plea agreement).

 In the alternative, applicant urges that Judge Bacon's refusal to accept the plea bargain was an abuse of discretion.[24] The procedure governing acceptance and rejection of a plea bargain is set forth in Article 26.13 of the Texas Code of Criminal Procedure, which provides, in part, that "the court shall inform the defendant whether it will follow *or reject* any such agreement in open court." Tex.Code Cr.P.Ann. art 26.13(a)(2) (Supp.1985) (emphasis added). The plain language of the statute confirms that a judge has discretion to decide whether or not to accept a plea bargain.

 State court judges in Texas have wide discretion in determining whether or not to accept a plea bargain. *See, e.g., Allen v. State*, 827 S.W.2d 69, 70 (Tex.App.—Houston [1st Dist.] 1992, no writ) (*citing State ex rel Bryan v. MacDonald*, 662 S.W.2d 5, 9 (Tex.Crim.App.1983). Nothing has been found in the Texas case law to suggest that a judge is required to articulate a reason for rejecting a plea bargain. Applicant's counsel validly asserted that the language of the Texas statute governing plea bargains closely parallels the federal rule on the same subject. While it is recognized that the instant

---

**23.** As recently as last term, the Supreme Court confirmed that certain types of constitutional errors are so severe that they do not require "harmless-error" analysis. *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). Exclusion of a juror solely on the basis of race is such an error. *Dawson v. Delaware*, —— U.S. ——, ——, 112 S.Ct. 1093, 1099, 117 L.Ed.2d 309 (1992) ("This Court previously has declined to apply harmless-error analysis to certain categories if constitu-

tional error." *Batson v. Kentucky*, 476 U.S. 79, 100, 106 S.Ct. 1712, 1725, 90 L.Ed.2d 69 (1986)).

**24.** Although the facts are somewhat murky, it appears that both Judge Lawlis and Judge Bacon sit in Newton County. It is unclear how judges are assigned to particular cases, or even if specific cases are assigned to individual judges.

matter is governed by state and not federal law and procedure, nonetheless, the analysis of the United States Court of Appeals for the Fifth Circuit is instructive to the extent that the federal and state schemes are similar. *Compare* Federal Rules of Criminal Procedure 11(e), *with* Tex.Code Cr.P.Ann. art 26.-13(a) (Supp.1985). In reviewing the proper role of federal district judges pursuant to Rule 11(e)(4) of the Federal Rules of Criminal Procedure, the Fifth Circuit has held that the decision of the trial court should stand except in extreme circumstances. *United States v. Bean,* 564 F.2d 700, 703 (5th Cir. 1964). After reviewing the procedural requirements of Rule 11, the court concluded that, "[g]iven these specific procedural requirements for entering guilty pleas, we find that the absence of any requirement that the court state its reasons for refusing a plea bargain indicates that no statement of reasons is necessary." *Id.* at 702, n. 4. *Bean's* clear holding is that trial judges have broad discretion in deciding whether to accept a plea bargain, and, as well, whether to articulate a reason for their decision.

In the face of these authoritative pronouncements, applicant, nevertheless, argues that Judge Bacon's rejection of the plea bargain was an abuse of discretion, and a violation of his rights under the Due process Clause of the Constitution, because he did not state any reason for rejecting the plea bargain. Assuming, *arguendo,* that Judge Bacon did not state any reason for rejecting the plea bargain, it does not follow that he abused his discretion in so doing. Applicant points to a Texas case which holds that an abuse of discretion occurs when a court acts "without reference to guiding rules or principles, or acts arbitrarily or unreasonably." *Ramsey v. Criswell,* 850 S.W.2d 258, 259 (Tex.App.—Texarkana, 1993, n.w.h.). Even so, applicant has not presented any evidence that Judge Bacon acted arbitrarily or unreasonably. Hence, it is determined that Judge Bacon's rejection of the plea bargain was not an abuse of discretion under Texas law.[25]

Applicant has not argued, and it is not found, that a rejection of a plea bargain which is in compliance with state law is a violation of applicant's rights under the Due Process Clause.

 Applicant additionally maintains that his Due Process rights were violated, because Judge Bacon engaged in *ex parte* communications regarding the plea bargain, and rejected the plea bargain outside the presence of applicant or his attorney. Applicant points out that, although there is no constitutional right to a plea bargain, if the parties enter into plea negotiations, the defendant does have a right under the Due Process Clause to fair treatment in connection with such a procedures. *Stokes v. Armontrout,* 851 F.2d 1085 (8th Cir.1988). While applicant's allegations are disturbing, he has not presented evidence to support his claim. No record of the plea rejection was ever made.[26] In fact, there is no record showing that the plea bargain was ever officially tendered to the judge for consideration. No other evidence has been presented indicating that Judge Bacon's actions were unconstitutional. Because applicant has failed to present evidence supporting his claim that the rejection of the plea bargain violated his rights under the Due Process Clause, it is determined that the applicant's motion for the writ of habeas corpus will be denied with respect to this issue.

## V. Conclusion

Having reviewed the record of the trial court, the pleadings submitted by the parties, and the arguments presented at the hearing on the merits, it has been determined that the manner in which applicant was tried for capital murder violated his rights under the Constitution. In summary, respondent has admitted error in regard to the sentencing phase of applicant's trial. In addition, the guilt-innocence phase of the trial was improper, since the jury was chosen in clear

25. The court does not mean to suggest that Judge Bacon's complete failure to communicate to the defendant his reason for rejecting the plea bargain was a model of judicial decisionmaking.

26. To some extent this supports applicant's claim that the rejection was made *ex parte* and off the record. However, applicant's attorney did not request a ruling on the plea bargain for the record.

violation of applicant's constitutional rights. Applicant has not proved that his rights were violated when Judge Bacon refused to accept a plea bargain entered into between applicant and the district attorney. Accordingly, in the final judgment in this matter issued concurrently herewith, Bennett's application for the writ of habeas corpus shall be granted.

## WRIT OF HABEAS CORPUS

In accordance with the findings of fact and conclusions of law set forth in the accompanying memorandum opinion, it is

**ORDERED** and **ADJUDGED** that the application for the writ of habeas corpus submitted by the applicant, Baby Ray Bennett, shall be, and it is hereby, **GRANTED.** It is further

**ORDERED** and **ADJUDGED** that applicant's conviction in Case No. 3589, in the District Court of Newton County, 1st Judicial District of Texas, shall be, and it is hereby, **VACATED.** It is further

**ORDERED** that applicant shall be released, if the State of Texas has not commenced proceedings for another trial of applicant within ninety days from the date of service of this order.